IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| HAAS OUTDOORS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:18-CV-978-RP |
| | § | |
| DRYSHOD INTERNATIONAL, LLC | § | |
| and JAMES K. DONOHUE, | § | |
| | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| DRYSHOD INTERNATIONAL, LLC | § | |
| and JAMES K. DONOHUE, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 1:18-CV-596-RP |
| | § | (consolidated) |
| HAAS OUTDOORS, INC., | § | |
| TOXEY HAAS, and WILLIAM SUGG, | § | |
| | § | |
| Defendants. | § | |

**<u>ORDER</u>**

Before the Court are cross-motions for partial summary judgment filed by Plaintiff Haas

Outdoors, Inc. ("Haas"), (Dkt. 163)[1], and Defendants Dryshod International, LLC, and James K.

Donohue (collectively, "Dryshod"), (Dkt. 158, 194).[2] Having considered the parties' arguments, the

evidence, and the relevant law, the Court will grant Haas's motion for partial summary judgment

and deny Dryshod's motion for partial summary judgment.

---

[1] The Court's citations throughout the remainder of the order refer to the sealed copy of Haas's motion for partial summary judgment, (Dkt. 164-1).
[2] The Court's citations throughout the remainder of the order refer to the sealed copy of Dryshod's motion for partial summary judgment, (Dkt. 158).

# I. BACKGROUND

This is a copyright and trademark infringement case involving camouflage patterns. Haas designs, manufactures, and licenses camouflage patterns for use in camouflage clothing and related accessories. (Am. Compl., Dkt. 126, at 3). Since 1986, Haas has manufactured—and licensed for manufacture by third parties—camouflage patterns, camouflage clothing, and accessories under the trademark MOSSY OAK. (Am. Compl., Dkt. 126, at 3). Haas also has a number of other registered marks related to its series of BREAK-UP patterns, including BREAK-UP, NEW BREAK-UP, BREAK-UP INFINITY, and BREAK-UP COUNTRY. (*Id.*).

Earlier in his career, Defendant James K. Donahue ("Donahue") founded a boot manufacturing company, Muck Boot Company ("Muck Boot"), that licensed Haas's MOSSY OAK patterns, including its NEW BREAK-UP pattern. (*Id.* at 5). While president of Muck Boot, Donahue personally communicated with Haas employees and requested samples of the MOSSY OAK patterns. (Email Requesting Samples, Dkt. 179-43, at 1). During his tenure at Muck Boot, Donahue set up distributor groups to sell his Muck Boot products, which included MOSSY OAK branded products. (Am. Compl., Dkt. 126, at 5). Donahue sold Muck Boot in 2004, but when Muck Boot decided to take its distribution in house in 2017, the two former Muck Boot distributors—Team J and CFD—approached Donahue about creating a new set of boot products. (Haas Resp., Dkt. 179-41, at 3). Donahue accepted the offer and trademarked the name DRYSHOD as the brand name of the new product line. (Email to Haas Rep., Dkt. 164-6, at 7).

The distributors asked that Dryshod use Mossy Oak products on all three of the introductory boot models. (*Id.* at 7). Donahue assured them that Dryshod would "only use genuine license camo patterns from Haas/Mossy Oak and Real Tree." (Dkt.179-45 at 2). In April 2017, Donahue contacted Haas representatives about obtaining a MOSSY OAK license and filled out a licensing application. (Dryshod Mot. Summ. J., Dkt. 158, at 9; Email to Haas Rep, Dkt. 158-6, at

14). He specifically asked for "clearance for temporary use" of the Mossy Oak pattern on "look-see development samples." (Email, Dkt. 179-7, at 1). Donahue noted that "[t]he samples would be used only for photo-communications with CFD management and would not be used at all for sales or marketing purposes." (*Id.*). At that time, he stated his current interest in the Mossy Oak pattern was "to have the ability to use the authentic patterns so we can select best colors and sizing for decorating the boots with logos or screen-printed elements." (*Id.*).

In one of these initial emails, Donahue wrote "I can assure you, if all goes as planned, we will be using a lot of Mossy Oak products and materials on DRYSHOD-brand outdoor products." (*Id.* at 13). Haas did not follow up with Donahue about this initial exchange or on Donahue's initial April 17, 2017, licensing application. (Dryshod Mot. Summ. J., Dkt. 158, at 9). At some point, Donahue picked the name MOBU for his new line of camouflage boots. Early on, a distributor providing feedback commented on the name, assuming MOBU stood for "Mossy Oak Break-Up." (Comparative Model Worksheet, Dkt. 179-47, at 3 ("MOBU meaning Mossy Oak Break-Up?")).

The following month, Donahue and the distributors became aware of the costs associated with licensing existing camouflage brands for his new boot line. Donahue informed distributors that "[w]e will use our own camo print to avoid fees and add-on costs from branded camo suppliers." (Cost Emails, Dkt. 179-48, at 4). Even so, Donahue explained the company would continue to use the name MOBU for boots made with its own camouflage pattern because MOBU could stand for "My Own Break-Up." (Email Dkt. 179-49, at 2). Specifically, Donahue wrote to distributors and other Dryshod employees: "I have some issues with Mossy Oak regarding their licensing fees, costs and restrictions on using a third party to apply the Hydrokote. If we can do our own camo print, it will still be referred to as MOBU, which stands for "My Own Break-Up." (*Id.*).

Around this same time, Donahue hired an artist by the name of Scott Hewett ("Hewett") to assist in designing the Dryshod camouflage pattern. (Donahue Dep., Dkt. 179-46, at 26-27). While

Donahue denies ever giving Hewett the Mossy Oak pattern, he emailed Hewett during the design process and stated:

> In looking over the trademarks for Mossy Oak patterns, I found they have attempted to include certain leaf types as trademark elements. Specifically maple leaves and leaves with rounded edges. I'm not sure if they are actually getting away with that but it is easy to get around by using a leaf style not covered in the language of their trademarks. The easiest way around it is to use a leaf that is not maple and with predominantly pointed tips. My choice would be the Spanish Oak or a derivative.

(Email to Hewett, Dkt. 179-50, at 1). Later, in discussing Hewett's preliminary drawings, Donahue noted that Hewett's drawings "looked very nice but [were] not as detailed as the prints from Mossy Oak." (Email, Dkt. 179-53).

Shortly after—and with licensing talks with Haas still stalled—Donahue emailed his distributors about the possibility of using True Timber's camouflage pattern instead. (Email, Dkt. 179-54, at 2). In assessing this option, Donahue noted "[t]he downside is, the material would not be Mossy Oak or 'My Own Breakup' so, the MOBU name would be in jeopardy. With MOBU, it might look like we are trying to pass off True Timber as Mossy Oak. That wouldn't make anyone happy." (Email, Dkt. 179-54, at 2).

Still having heard nothing back from Haas about his initial April 2017 licensing application, Donahue followed up with Haas representatives, again expressing interest in licensing the Mossy Oak camouflage pattern for his product line. (Email to Haas Rep, Dkt. 179-42, at 4). In that follow-up email, Donahue compared the Mossy Oak pattern with competitor True Timber's camouflage pattern and noted: "True Timber is an adequate brand but I feel strongly that the new [Dryshod] hunting models will have a better chance of achieving mass appeal if we use the Mossy Oak patterns on the boots." (*Id.* at 4).

After reinitiating contact with Haas, Dryshod requested permission to use "300 [yards] of Mossy Oak breakup just collecting dust in [the materials warehouse]" to make samples for his new boot line. (Email, Dkt. 179-42, at 2). A Haas representative responded "[i]f this is unused fabric

that would otherwise be disposed of and not currently in use for other Licensees, then they are approved to proceed. This would be a one-time approval as we understand this is a time sensitive matter." (*Id.*). Donahue then instructed Pepei, a Dryshod employee responsible for interfacing with the textile factory in China, to outfit MOBU sample boots with the MOSSY OAK pattern. (Email, Dkt. 179-55, at 1 ("[I]t is okay to make the MOBU samples with Mossy Oak, if necessary."); Email, Dkt. 179-56, at 1 ("I decided to specify Mossy Oak on just one boot sample."); Email Dkt. 179-59 at 2 ("Ms. Zhang used the Mossy Oak Break-Up on all of the mens and womens' premium boots and only used DIY camo on two kids' boots."); Photographs of Samples, Dkt. 179-44, at 1-3)).

Meanwhile, Hewett continued to tweak the commissioned camouflage painting in accordance with Donahue's feedback. At some point though, Donahue decided to pursue a "backup option." (Dryshod Mot. Summ. J., Dkt. 158, at 11). According to Donahue, he set up "Live Oak bark, Live Oak leaves, Spanish Oak leaves, Texas Ball Boss, Live Oak sprigs and a few sprigs of Mountain Laurel" in his yard and took a picture of the arrangement with his iPhone. (*Id.* at 12). He then sent this photo to a graphics technician at a textile supplier in Dongguan, China, to prepare a camouflage pattern based on the photo. (*Id.*). In doing so, he instructed the graphics technician to "make modifications, such as color correction, scaling, and stepping and repeating the photograph to turn it into a pattern suitable to pass as camouflage." (*Id.* at 12). During the design process, the "graphics technician also manipulated a limited number of elements found within the photograph to cover or hide edges of repeated frames." (*Id.*).

Dryshod contends that "[a]t no time during the development of the Dryshod camouflage pattern was a Mossy Oak design or pattern used for reference." (*Id.*). Haas, on the other hand, contends Donahue "continued to have issues with his pattern" and highlights an email Donahue sent to Pepei stating "I am comparing the image size and quality to the Mossy Oak camo and find that the image size and print quality of ours is very weak compared to the Mossy Oak." (Haas

Email, Dkt. 179-58, at 1). According to Haas, all of the modifications and enhancements noted above ultimately brought the Dryshod pattern "closer and closer to Mossy Oak Break-Up." (Haas Resp., Dkt. 179-41, at 7). In support, Haas highlights a September 2017 email in which Donahue "expressed dismay to his Chinese employee that on the most recent sample boots, the factory had affixed a MOBU pattern on part of the boot and Mossy Oak Break-Up on another part of the same boot." (Haas Mot. Summ. J., Dkt. 179-41, at 7. In that email, Donahue wrote, "what I immediately noticed is, the lateral side of the bootie was made with the correct MOBU laminated material but the medial side was Mossy Oak material . . . . I have no idea why or how someone could make such a mistake but someone was not paying attention." (Email, Dkt. 179-61, at 1). Haas argues that this email confirms "[t]he two patterns were so similar that even manufacturers of the boots could not tell them apart." (Haas Resp., Dkt. 179-41, at 7).

Donahue then set out to design a tag for his boots to explain the term MOBU. The tag read as follows:

> Rather than get caught up in today's camo wars, we decided to make our own. It's called MOBU-short for "My Own Break-Up." Now those licensing fees can go into providing additional features like HYDROKOTE hydrophobic water repellant and 4-way stretch uppers. Get more with MOBU!

(MOBU Tag, Dkt. 179-62, at 1). In explaining the thought process behind the tag, Donahue stated that he "really struggled" because he "thought there was a chance people would thing [sic] we were being cheap or weaselly." (Boot Tag Email, Dkt. 179-63, at 1). Ultimately, he decided to include the explanation for MOBU on the tag and "cast it as an acronym for My Own Break-Up." (*Id.* at 2). He further clarified that he "did this just in case Mossy Oak took exception to the MOBU name as a way to confuse the public into thinking that MOBU was short for Mossy Oak Break-Up." (*Id.* at 2).

After the tags had been placed on the Dryshod boots, a distributor informed Donahue that "Break-Up" was trademarked. (Email, Dkt. 179-64, at 1). Donahue acknowledged that Haas had trademarked "Break-Up," and, as a result, Haas "might take exception to including the word 'break-

up' in the explanation on the back of the hang tag." (*Id.*). He instructed his team to remove the small MOBU tags from the boots and noted "I probably made a mistake by thinking we needed to provide an explanation for the MOBU name. If we treat is [sic] as just a name with no printed explanation, then there is no chance of infringement." (*Id.*).

Haas sent Donahue a licensing agreement for his signature in July 2017. (Email with Licensing Agreement, Dkt. 158-6, at 10). But by August, Donahue told Haas he was "in a holding pattern on which camo brand and patterns [Dryshod] would move forward with." (*Id.*) He further expressed concerns to Haas representatives about "Mossy Oak charging a royalty fee on a per unit basis and the monthly accounting" Dryshod would have to do "to be in compliance with the Mossy Oak licensing agreement." (*Id.* at 10). By December, Donahue informed Haas that he had decided to "pass on adopting Mossy Oak (or any other licensed camo brand) for the initial DRYSHOD product line." (*Id.* at 12).

Haas, believing that the MOBU pattern infringes its coyrighted NEW BREAK-UP pattern and that the MOBU mark infringes its MOSSY OAK and BREAK-UP trademarks, sued Donahue and Dryshod (collectively, "Dryshod") in February 2018 in the Northern District of Mississippi. (Dkt. 1). The case has since been transferred to this district, (Dkt. 96, 97), and consolidated with Dryshod's countersuit, (Dkt. 111).

In Haas's action against Dryshod, Haas asserts five causes of action: (1) copyright infringement in violation of 17 U.S.C. § 501; (2) trademark infringement in violation of 15 U.S.C. § 1114; (3) trademark dilution in violation of 15 U.S.C. § 1125; (4) trademark infringement and dilution in violation of Texas and Mississippi law; and (5) trademark denial or cancellation under 15 U.S.C. § 1052(d). (Haas Am. Compl., Dkt. 126, at 7-15). Dryshod moves for summary judgment on Haas's claims for copyright infringement, unfair competition under 15 U.S.C. § 1125, common law

trademark infringement of MOBU, and denial of registration of MOBU. (Dryshod Mot. Summ. J., Dkt. 158, at 7).

In its countersuit against Haas, Dryshod asserts six causes of action: (1) declaratory judgment of copyright non-infringement of the Mossy Oak Break-Up patterns; (2) declaratory judgment of copyright invalidity/enforceability; (3) declaratory judgment of trademark noninfringement of the Mossy Oak Break-Up marks; (4) tortious interference with existing business relations; (5) restraint of trade in violation of Texas Business and Commerce Code § 15.05(a) and (b); and (6) defamation. (Dryshod Am. Compl., Dkt. 123, at 24–29). Dryshod further seeks punitive damages. (*Id.* at 29). Haas asks for summary judgment on the following causes of action in Dryshod's amended complaint: Count II: declaratory judgment of copyright invalidity/unenforceability; Count IV: Texas common law tortious interference with existing business relations; Count V: restraint of trade in violation of Texas Business Commerce Code § 15.05; Count VI: defamation under Texas common law; Count VII: punitive damages. In addition, Haas moves for summary judgment on Dryshod's affirmative defenses based on lack of standing, (Am. Answer, Dkt. 130, at 5), and unclean hands, (*id.* at 6–7); and Dryshod's counterclaim, which alleges all of Haas's "Break Up" trademarks are generic and not entitled to trademark protection, (*id.* at 10–13). The Court addresses each party's partial motion for summary judgment in turn.

## II. LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if its resolution in favor of one party

might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotations and footnote omitted). When reviewing a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Furthermore, a court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

If the moving party does not bear the ultimate burden of proof, after it has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). When the movant bears the burden of proof, she must establish all the essential elements of her claim that warrant judgment in her favor. *See Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002). In such cases, the burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017).

Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Furthermore, the nonmovant is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Federal Rule of Civil Procedure 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* After the nonmovant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Miss. River Basin All. v. Westphal,* 230 F.3d 170, 175 (5th Cir. 2000). Cross-motions for

summary judgment "must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538–39 (5th Cir. 2004).

## III. DISCUSSION

### A. Dryshod's Partial Motion for Summary Judgment

Dryshod moves for summary judgment on Counts I (copyright infringement), II (unfair competition under 15 U.S.C. § 1125), IV (common law trademark infringement of MOBU), and V (denial of registration of MOBU). (Dryshod Mot. Summ. J., Dkt. 158, at 7). The Court finds that Haas has put forth sufficient evidence to show that a genuine issue of material fact exists as to all these claims. This precludes summary judgment in Dryshod's favor. The Court will address each of Haas's claims in turn.

#### 1. Copyright Infringement

To prove copyright infringement, a plaintiff must establish "(1) ownership of a valid copyright; (2) factual copying; and (3) substantial similarity." *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 549 (5th Cir. 2015) (quoting *Armour v. Knowles*, 512 F.3d 147, 152 (5th Cir. 2007)). The second prong, factual copying, can be proven by either direct or circumstantial evidence. *Armour v. Knowles*, 512 F.3d 147, 152 (5th Cir. 2007). Because direct evidence of copying is rarely available, factual copying may be inferred from (1) proof that the defendant had access to the copyrighted work prior to creation of the infringing work and (2) probative similarity." *Engenium Sols., Inc. v. Symphonic Techs., Inc.*, 924 F. Supp. 2d 757, 783 (S.D. Tex. 2013). "To establish access, a plaintiff must prove that 'the person who created the allegedly infringing work had a reasonable opportunity to view the copyrighted work' before creating the infringing work." *Armour*, 512 F.3d at 152–53. "Taking the access and summary judgment standards together, a plaintiff can survive summary judgment only if his evidence is *significantly probative* of a *reasonable opportunity* for access."

*Id.* at 147. To show probative similarity, a plaintiff must show "the works contain similarities that are probative of copying." *Id.* A factfinder could find that two works are probatively similar "if there are any similarities between the two works (whether substantial or not) that, in the normal course of events, would not be expected to arise independently in the two works and that therefore might suggest that the defendant copied part of the plaintiff's work." *Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 370 (5th Cir. 2004), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010).

"If a plaintiff establishes an inference of factual copying (by showing access and probative similarity), the defendant can rebut that inference, and thus escape liability for infringement, if he can prove that he independently created the work." *Engenium Sols.*, 924 F. Supp. at 783 (citing *Positive Black Talk Inc.*, 394 F.3d at 368). But not all copying is legally actionable. *Peel & Co. v. The Rug Mkt.*, 238 F.3d 391, 395 (5th Cir. 2001). "If a plaintiff has established factual copying (and the defendant does not establish independent creation), the plaintiff must also prove that the copyrighted work and the allegedly infringing work are substantially similar." *Huffman v. Burnt Puppy Music*, No. 6:16-CV-355-RP, 2017 WL 11046666, at *2 (W.D. Tex. Feb. 1, 2017).

To assess substantial similarity, "a side-by-side comparison must be made between the original and the copy to determine whether a layman would view the two works as 'substantially similar.'" *Id.* (quoting *Creations Unlimited, Inc. v. McCain*, 112 F.3d 814, 816 (5th Cir. 1997)). This determination is an objective one from the standpoint of an "ordinary observer": would a layman detect piracy "without any aid or suggestion or critical analysis by others"? *Peel & Co.*, 238 F.3d at 398; *see also id.* (citation and quotation marks omitted) ("The reaction of the public to the matter should be spontaneous and immediate."). Although the question of substantial similarity "typically should be left to the factfinder," it can be decided as a matter of law "if the court can conclude,

after viewing the evidence and drawing inferences in a manner most favorable to the nonmoving party, that no reasonable juror could find substantial similarity of ideas and expression." *Id.* at 395.

Dryshod contends it is entitled to summary judgment on Haas's copyright infringement claim because Donahue independently created the camouflage pattern he is alleged to have infringed. (Mot. Summ. J., Dkt. 158, at 14). In support of this independent creation defense, Dryshod argues that after Hewett's painting failed to arrive in time for Donahue's second trip to the Chinese factory, Donahue set up "[l]ive Oak bark, Live Oak leaves, Spanish Oak leaves, Texas Ball Boss, Live Oak sprigs and a few sprigs of Mountain Laurel" in his yard and took a picture of the arrangement with his iPhone. (Dryshod Mot. Summ. J., Dkt. 158, at 20–21). He then sent this photo to the factory he was working with in China and asked the factory to prepare a camouflage pattern based on the photo. (*Id.* at 15). Dryshod argues that its camouflage pattern "is based on Mr. Donahue's single iPhone photo, which is based on the photos Mr. Hewett took along with the painting—none of which were copied from Haas' NEW BREAK-UP pattern." (*Id.* at 16). Because Donahue independently created the camouflage pattern—a defense Dryshod argues Haas concedes—Dryshod contends it is entitled to summary judgment on Haas's copyright infringement claim.[3] (*Id.* at 14–16).

Haas disputes Dryshod's independent creation defense and contends direct and circumstantial evidence of copying exist in this case. (Resp., Dkt. 179-41, at 11). As direct evidence of copying, Haas points to Dryshod's plan to use Haas's NEW BREAK-UP pattern on their boots,

---

[3] Dryshod argues that Haas conceded the independent creation defense. (Dryshod Mot. Summ. J., Dkt. 158, at 22). Haas disputes this because Dryshod improperly bases that assertion about a legal conclusion on the lay testimony provided by Bill Sugg and Larry Moore, testimony they gave before they were able to review most of the evidence obtained in discovery. (Haas Resp., Dkt. 179-41, at 8). Specifically, Haas contends that Dryshod questioned Sugg and Moore about Donahue's creation of the camouflage pattern before they had been able to review documents that had been improperly designated as "Attorneys' Eyes Only." (*Id.* at 9). The Court need not delve into the prior discovery dispute between the parties, but notes only that the fact testimony given by Haas's lay witnesses does not concede the legal theory of independent creation.

their creation of actual samples using the NEW BREAK-UP pattern, and discussions about the need to mimic the colors in Haas's patterns. (*Id.* at 11). According to Haas, Dryshod also "discussed efforts to conceal their copying by making minor changes to the types of leaves they believed Haas was using. (*Id.*). Specifically, Haas points to an email exchange between Donahue and Hewett, the artist hired by Donahue, in which Donahue explained they could avoid a conflict with Haas by using "a leaf style not covered in the language of [Haas's] trademarks." (Email, Dkt. 179-50, at 1). He further noted that "[t]he easiest way around it is to use a leaf that is not maple and with predominantly pointed tips." (*Id.*).

Haas also argues that there is sufficient circumstantial evidence of access and probative similarity to create an inference of factual copying. (Resp., Dkt. 179-41, at 9). In terms of access, Haas notes that a month before Donahue took the photo in his backyard of the arranged twigs and leaves, Defendants created mockups using Haas's NEW BREAK-UP pattern, which they labeled "MOBU." (*Id.* at 11). Haas further notes that Donahue previously worked for a boot company that sold boots "clad in BREAK-UP and NEW BREAK-UP patterns" and submitted an application to again license Haas's camouflage pattern for his new line of camouflage boots. (*Id.* at 11). Haas further contends that the two patterns are probatively similar and cites to the Court's prior finding at the motion to dismiss stage that Haas had plausibly alleged substantial similarity. (Resp., Dkt. 179-41, at 12; Order, Dkt. 141, at 4-7).

The Court concludes that Haas has provided sufficient circumstantial evidence of access and probative similarity to create a fact question on the issue of factual copying. Indeed, Haas's evidence suggests Donahue had a longstanding familiarity with the Mossy Oak camouflage line. First, Donahue was the founder and president of the Muck Boot Company, a well-known boot manufacturer and licensee of Mossy Oak camouflage patterns. (Am. Compl., Dkt. 126, at 5). Donahue himself admits the Mossy Oak line of camouflage patterns was an important part of that

company's success, and when he set out to create the new Dryshod brand and product line, he applied to license the Mossy Oak line again. (*See* email, Dkt. 179-42, at 5-7; Licensing App., Dkt. 179-68, at 1–2). In licensing talks with Haas representatives, Donahue compared Haas's Mossy Oak pattern with True Timber, noting that while "True Timber is an adequate brand[,] I feel strongly that the new DS [Dryshod] hunting models will have a better chance of achieving mass appeal if we use the Mossy Oak patterns on the boots." (Email to Haas Rep, Dkt. 179-42, at 4). He only abandoned plans to license Mossy Oak pattern when costs got too high. (Cost Emails, Dkt. 179-48, at 4 ("We will use our own camo print to avoid fees and add-on costs from branded camo suppliers.")).

Later, Defendants created mockup boots featuring the Mossy Oak Pattern. (Email, Dkt. 179-55, at 1 ("[I]t is okay to make the MOBU samples with Mossy Oak, if necessary."); Email, Dkt. 179-56, at 1 ("I decided to specify Mossy Oak on just one boot sample."; Email, Dkt. 179-59, at 2 ("Ms. Zhang used the Mossy Oak Break-Up on all of the mens and womens' premium boots and only used DIY camo on two kids' boots."); Photographs of Samples, Dkt. 179-44, at 1-3 ). Donahue demonstrated further familiarity with the Mossy Oak pattern in emails to the artist he hired to aid in pattern design:

> In looking over the trademarks for Mossy Oak patterns, I found they have attempted to include certain leaf types as trademark elements. Specifically maple leaves and leaves with rounded edges. I'm not sure if they are actually getting away with that but it is easy to get around by using a leaf style not covered in the language of their trademarks. The easiest way around it is to use a leaf that is not maple and with predominantly pointed tips. My choice would be the Spanish Oak or a derivative."

(Email to Hewett, Dkt. 179-50, at 1). Later, in discussing Hewett's preliminary drawings with distributors, Donahue noted that Hewett's drawings "looked very nice but [were] not as detailed as the prints from Mossy Oak." (Email, Dkt. 179-53).

A reasonable juror could infer from this evidence that Donahue had a reasonable opportunity to access Haas's camouflage pattern before he developed the allegedly infringing pattern. As for probative similarity, the Court previously concluded at the motion to dismiss stage that Haas had plausibly alleged substantial similarity and Dryshod has not pointed to any evidence to occasion a reevaluation of this conclusion. (Order, Dkt. 141, at 7). Haas points to evidence that Donahue had access to and was even using Haas's camouflage pattern before he took the iPhone photo from which the allegedly independently created camouflage pattern emerged. All of this is sufficient to create a fact issue precluding summary judgment on Dryshod's independent creation defense.

Alternatively, Dryshod contends they are entitled to summary judgment on Haas's copyright infringement claim because no reasonable juror could find that their camouflage pattern is substantially similar to Haas's pattern. (Dryshod Mot. Summ. J., Dkt. 158, at 17). In assessing substantial similarity, Dryshod contends that the Court must take the "unprotectable elements of the copyrighted work" into account. (Dryshod Reply, Dkt. 181-1, at 9). According to Dryshod, because "the majority of the elements in Haas' camouflage pattern are unprotectable elements, there is a 'narrow range of expression' and copyright protection is thin." (*Id.* at 9 (citing *Lennar Homes of Texas Sales & Mktg., Ltd. v. Perry Homes, LLC*, 117 F. Supp. 3d 913, 935 (S.D. Tex. 2015)). When this is the case, Dryshod argues a heightened showing is required; that is "a work must be 'virtually identical' to infringe." (*Id.*).

In arguing for the heightened "virtually identical" standard, Dryshod hinges its argument on a standard unadopted by the Fifth Circuit. Moreover, even if the Ninth Circuit standard did apply, the "original selection coordination, and arrangement" of the natural elements in Haas's pattern is expression entitled to broad protection and subject to a substantial similarity analysis. *See L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 850 (9th Cir. 2012), *as amended on denial of reh'g and*

*reh'g en banc* (June 13, 2012) (holding that while a floral pattern contains natural elements that are not protectible, "the original selection, coordination, and arrangement of such elements is protectible" and entitled to broad copyright protection and the substantial similarity test applies because there is a "wide range of expression for selecting, coordinating, and arranging floral elements in stylized fabric designs.").

The Court previously held at the motion to dismiss stage that Haas had plausibly alleged substantial similarity, and Defendants have not put forth any summary judgment evidence to necessitate a reevaluation of this determination.[4] *See* Order, Dkt. 14, at 7 (noting the similarities between the two patterns).

Because Haas has raised a genuine issue of material fact as to whether Defendants copied its camouflage pattern, Defendants are not entitled to summary judgment on Haas's copyright infringement claim.

## 2. Trademark Infringement

To prevail on a trademark infringement claim, a plaintiff must show (1) ownership in a legally protectible mark, and (2) infringement resulting from a likelihood of confusion. *Bd. of Supvrs. for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 475 (5th Cir. 2008). To be legally protectable, a mark must be either (a) inherently distinctive or (b) have acquired distinctiveness through secondary meaning. In assessing the distinctiveness of a word mark, the

---

[4] The Court notes that Defendants' side-by-side comparison of the two patterns in Defendants' motion for summary judgment are insufficient to dispute substantial similarity. (*See* Mot. Summ. J., Dkt. 158, at 24). In its response, Haas argues that the side-by-side comparison compares "several repeats of [Defendants'] Camo pattern" with "less than full repeat of a larger-sized NEW BREAK-UP" pattern. (Resp., Dkt. 179-41, at 18). According to Haas, the more accurate comparisons are the previous comparison cited by the Court in its order denying Defendants' motion to dismiss, (Order, Dkt. 141, at 6) and the screenshot of Larry Moore comparing the two patterns on the same scale during his deposition, (Dkt. 179-34; *see also* Parrish Decl., Dkt. 179-33, at 1–7). Viewing these images in the light most favorable to Haas, the nonmovant, the Court concludes that Haas has raised a genuine fact issue with respect to substantial similarity that precludes summary judgment. *Tolan v. Cotton*, 572 U.S. 650, 657, 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014).

Fifth Circuit relies on the categories set forth in *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir. 1976) ("*Abercrombie*"): (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful. *See Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 537 (5th Cir. 2015) (noting that the Fifth Circuit relies on the spectrum set forth in *Abercrombie* to determine the distinctiveness of a word mark). Assigning a word mark to a category is important because the assignment "determines whether or not, or in what circumstances, the word or phrase is eligible for trademark protection*." Union Nat. Bank of Texas, Laredo, Tex. v. Union Nat. Bank of Texas, Austin, Tex.*, 909 F.2d 839, 844 (5th Cir. 1990). For example, generic terms are never eligible for trademark protection, while descriptive terms "may only be protected after proof of secondary meaning." *Id.* Meanwhile, suggestive, arbitrary, or fanciful terms "are all protectable without proof of secondary meaning." *Id.* Importantly then, proof of secondary meaning is not required if the mark is at least suggestive. *See Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 232 (5th Cir. 2009).

*i. Categorization*

A *generic* term "identifies a genus or class of things or services, of which the particular item in question is merely a member." *Xtreme Lashes, LLC*, 576 F.3d at 232. For example, "fish" is a generic term because it applies with equal force to sole, haddock, perch, salmon, bass and carp." *Id.* A *descriptive* term, on the other hand, "identifies a characteristic or quality of an article or service, such as its color, odor, function, dimensions, or ingredients." *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 539 (5th Cir. 2015). Meanwhile, a *suggestive* term "suggests rather than describes, some particular characteristic of the goods or services to which it applies and requires the consumer to exercise the imagination in order to draw a conclusion as to the nature of goods and services." *Union Nat. Bank of Texas, Laredo, Tex.*, 909 F.2d at 845. Finally, arbitrary and fanciful terms "are either coined words or words which are not suggestive of the product or service." *Id.*

Fanciful terms include coined words such as "Xerox" or "Kodak." *Id.* Arbitrary terms refer "to ordinary words which do not suggest or describe the services involved." *Id.*

In determining whether a mark is descriptive or suggestive, the Fifth Circuit uses the "imagination test," which "seeks to measure the relationship between the actual words of the mark and the product to which they are applied." *Nola Spice Designs*, 783 F.3d at 539. "If a word requires imagination to apply it to the product or service in question, it tends to show that the term as used is suggestive. On the other hand, if the word conveys information about the product, it is descriptive." *Id.*

When categorizing a mark, the court "must examine the context in which the term is used." *Id.* at 537. Relevant questions include "how the term is used with other words, the products or services to which it is applied, and the audience to which the relevant produce or service is directed." *Id.* Given these fact-intensive inquiries, summary judgment is "rarely appropriate on the factual question of categorization" and may be granted only where the "record compels the conclusion that the movant is entitled to judgment as a matter of law." *Id.* at 538.

*ii. Parties' Arguments*

Defendants contend they are entitled to summary judgment on Haas's trademark infringement claims because "MOBU" is not entitled to common law trademark protection. (Mot. Summ. J, Dkt. 158, at 13). Specifically, Defendants contend that Haas "has failed to produce any evidence to support its claim that 'MOBU' has acquired secondary meaning." (*Id.*). Defendants then proceed through the secondary meaning factors to argue that Haas has failed to put forth sufficient evidence to show that MOBU has acquired secondary meaning. (*Id.* at 25–30).

But in briefing the secondary meaning factors without first showing MOBU is in fact a descriptive term requiring proof of secondary meaning, Dryshod sidesteps the threshold inquiry of categorization. In its initial motion for summary judgment, Dryshod does not put on any summary

judgment evidence that MOBU is a descriptive mark—the only category of mark that would require secondary meaning. (*See* Dryshod Mot. Summ. J., Dkt. 158, at 25–30). As Haas rightly notes, Dryshod cannot "skip *Abercrombie* factors, presume descriptiveness, and jump straight to the issue of secondary meaning." (Resp., Dkt. 179-41, at 20). And without first showing that MOBU is in fact a descriptive term, Dryshod cannot point to Haas's failure to provide summary judgment evidence of acquired secondary meaning as entitling them to judgment as a matter of law. Proof of secondary meaning is not required if the mark is at least suggestive. *See Xtreme Lashes*, 576 F.3d at 232.

In its reply, Dryshod addresses the issue of categorization raised in Haas's response and argues that Haas has "never before argued that MOBU is inherently distinctive" and it has therefore waived this argument. (Reply, Dkt. 181-1, at 11). Again, Dryshod's argument misses the mark. Haas's role as the nonmovant at the summary judgment stage is to put forth evidence of a genuine fact dispute on the issue of common law trademark protection. Highlighting a fact issue with respect to categorization *is* surfacing a fact dispute that—if unrebutted by Dryshod—makes summary judgment inappropriate. Viewing the evidence in the light most favorable to Haas, the Court concludes Haas has raised a fact issue with respect to the categorization of the MOBU mark thus precluding summary judgment in Dryshod's favor.

## B.  Haas's Motion for Partial Summary Judgment

After Haas filed its suit against Dryshod, Dryshod filed a countersuit against Haas seeking declarations of non-infringement and cancellation of NEW BREAK-UP due to fraud on the copyright office, alleging restraint of trade and tortious interference with existing business relations, and alleging defamation for alleged statements made by Haas about Dryshod's camouflage pattern. (Haas Mot. Summ. J., Dkt. 164-1, at 7 (summarizing Dryshod's claims)). Dryshod also sought punitive damages. That case—1:18-CV-596-RP—was consolidated with Haas's first-filed case, 1-

18-CV-978-RP. (Order Consolidating Cases, Dkt. 111). Haas now moves for summary judgment

on the following causes of action alleged in Dryshod's First Amended Complaint, (Dkt. 123):

- Count II: Declaratory Judgment of Copyright Invalidity/Unenforceability; Count IV: Texas common law tortious interference with existing business relations; Count V: Restraint of Trade in Violation of Texas Business Commerce Code § 15.05; Count VI: Defamation under Texas Common Law; Count VII: Punitive Damages
- Defendants' affirmative defenses based on lack of standing, (Am. Answer, Dkt. 130, at 5), and fraud and unclean hands, (*id.* at 6–7); and
- Defendants' counterclaim, which alleges all of Haas's "Break Up" trademarks are generic and not entitled to trademark protection, (*id.* at 10–13).

### 1. Fraud on the Copyright Office and Dryshod's Affirmative Defenses

In its First Amended Complaint, Dryshod seeks a declaration that Haas's copyright

registrations are invalid and unenforceable under 28 U.S.C. § 2201 because "Haas committed fraud

on the Copyright Office" and "has unclean hands in falsely procuring these registrations and by

plagiarizing pre-existing camouflage designs." (*Id.* at 26). The party alleging fraud on the Copyright

Office "bears a heavy burden." *Spectrum Creations, Inc. v. Catalina Lighting, Inc.*, No. CIV.A.SA-00-

CA-875-F, 2001 WL 1910566, at *10 (W.D. Tex. Aug. 1, 2001). Satisfying this burden requires

establishing that (1) the application for copyright registration is factually inaccurate; (2) those

inaccuracies were willful or deliberate; and (3) the Copyright Office relied on those

misrepresentations. *Id.* "There must be a showing of 'scienter' in order to invalidate a copyright

registration." *Interplan Architects, Inc. v. C.L. Thomas, Inc.*, No. 4:08-CV-03181, 2010 WL 4366990, at

*24 (S.D. Tex. Oct. 27, 2010); *see also* 17 U.S.C. § 411 ("A certificate of registration satisfies the

requirements of this section and section 412, regardless of whether the certificate contains any

inaccurate information, unless . . . the inaccurate information was included on the application for

copyright registration with knowledge that it was inaccurate."). "[A] misstatement or clerical error

in the registration application if *unaccompanied by fraud* will not invalidate the copyright nor render

the registration certificate incapable of supporting an infringement action." (*Interplan Architects, Inc.*,

2010 WL 4366990, at *24 (citing 2 M. Nimmer & D. Nimmer, Copyright § 7.20[B] at 7–208, § 7.18[C][1] at 7–201 (2000)).

Haas contends it is entitled to summary judgment on Dryshod's fraud on the copyright office claim and affirmative defenses of unclean hands and lack of standing because Dryshod puts forth no evidence of fraudulent intent. (Haas Mot. Summ. J, Dkt. 164-1, at 10). Meanwhile, Dryshod argues Haas "falsely claimed authorship of the original work titled 'MOSSY OAK'" in its application to the Copyright Office because other individuals who were not employed by Haas contributed to the pattern's creation and Haas copied the pattern from preexisting Trebark and Realtree designs. (Resp., Dkt. 175-1, at 7–8). Dryshod points to letters exchanged between Toxey Haas and Juanita Crowder, a textile printer, and a radio show interview with Haas where he described working with a commercial artist in the design process as evidence that "puts authorship of [MOSSY OAK] into question." (Resp., Dkt. 175-1, at 8). Dryshod contends side-by-side comparisons of the MOSSY OAK pattern with Trebark and Realtree patterns that have "the exact same type of bark-style line work and coloration" show Haas copied the existing Trebark and Realtree brands and fraudulently claimed ownership in their copyright application. (*Id.* at 8–9).

Dryshod's copyright fraud arguments are not limited to Haas's MOSSY OAK pattern. It also argues that Haas's BREAK-UP pattern and NEW BREAK-UP patterns are unauthorized derivative works because these two patterns incorporate the preexisting—and allegedly fraudulently registered—MOSSY OAK pattern. (Resp., Dkt. 175-1, at 10–11). Dryshod makes an additional argument with respect to the validity of the BREAK-UP registration. In addition to being an unauthorized derivative work, Dryshod contends that the BREAK-UP registration also fraudulently stated it was "a work made for hire" when in fact an independent contractor named Gregg Parrish contributed to its creation. (*Id.* at 10). Because Parrish—"a freelance artist who was not an employee of Haas"—created BREAK-UP by "manipulating images in Photoshop," BREAK-UP

does not qualify as a work for hire. Parrish, says Dryshod, is then "at least the co-owner" of BREAK-UP and Haas therefore misrepresented its ownership in its copyright registration. (*Id.*).

But even if Dryshod's evidence called creation of the MOSSY Oak pattern into question, it has failed to produce evidence that Haas made misrepresentations to the Copyright Office with the intent to defraud. When asked during his deposition about whether he had any evidence of Haas's knowing misrepresentation to the Copyright Office, Donahue only noted that Toxey Haas's story about creating the MOSSY OAK pattern from "a fist full of dirt" and a "bag of leaves" was "a fraud" because "[t]here's no leaves in the design" and "no twigs in the design." (Donahue Dep., Dkt. 164-9, at 42). As Haas rightly notes, Donahue's answer is irrelevant to the fraudulent intent inquiry because it is not probative of whether Haas willfully or deliberately made misrepresentations in the application for copyright. Instead, Donahue's answer alleges fraud in the "post-application *marketing* of the Bottomland[5] pattern." (Haas Mot. Summ. J., Dkt. 164-1, at 10–11). That is, "[e]ven if their argument that Haas should not reference leaves when leaf shapes are absent had any merit . . . this does not demonstrate 'willful or deliberate' inaccuracies in the application submitted to the Copyright Office" because these marketing statements "are not found in the application to the Copyright Office" and "occurred after registration of Bottomland." (Haas Mot. Summ. J., Dkt. 164-1, at 11).

Absent evidence pertaining to Haas's intent to defraud the Copyright Office in its registration of the MOSSY OAK pattern, Dryshod has failed to create a question of material fact about the validity of the MOSSY OAK registration. And without evidence on these elements with respect to MOSSY OAK, Dryshod also cannot claim the BREAK-UP or NEW-BREAKUP

---

[5] MOSSYOAK is also known as BOTTOMLAND, and the parties refer to the pattern at issue by both names throughout their motions.

patterns are unauthorized derivative works. Accordingly, Haas is entitled to judgment as a matter of law on Dryshod's fraud on the copyright claim.

With respect to Dryshod's affirmative defenses of lack of standing and unclean hands, Dryshod contends, the Court has already resolved the underlying fraud on the Copyright Office claim in Haas's favor. Haas is accordingly entitled to summary judgment on Dryshod's lack of standing and unclean hands defenses as well.

## 2. Restraint of Trade in Violation of Tex. Bus. Com. Code § 15.05

Haas next contends that it is entitled to summary judgment on Dryshod's restraint of trade claim. Under the Texas Business and Commerce Code, "[i]t is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce." Tex. Bus. & Com. Code § 15.05. Dryshod contends Haas "has attempted to monopolize, and has monopolized, the market for leaf-bark genre hunting camouflage throughout the United States." (Dryshod Am. Compl., Dkt. 123, at 28).

To establish that Haas has monopolized the relevant market under § 15.05(b), Dryshod must show (1) Dryshod's possession of monopoly power in the relevant market and (2) Dryshod's willful acquisition or maintenance of that power, as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident. *Caller-Times Pub. Co. v. Triad Commc'ns, Inc.*, 826 S.W.2d 576, 580 (Tex. 1992). A plaintiff may establish this second element by showing the monopolist charged predatory prices. *Id.* In order to prevail on an attempted monopolization claim under § 15.05(b), Dryshod must prove (1) that Haas engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize the relevant market and (3) a

dangerous probability of achieving monopoly power."[6] *Star Tobacco Inc. v. Darilek*, 298 F. Supp. 2d 436, 447 (E.D. Tex. 2003) (citing *Spectrum Sports, Inc., v. McQuillan*, 506 U.S. 447, 459 (1993)); *see also Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Par.*, 309 F.3d 836, 839 (5th Cir. 2002) (discussing the elements of an attempted monopolization claim under § 2 of the Sherman Act). "As a prerequisite to both of its antitrust claims, [Dryshod] must define the relevant product and geographic market in which [Haas] had market power." *Nukote of Illinois, Inc. v. Clover Holdings, Inc.*, No. 3:10-CV-00580-P, 2015 WL 13729264, at *9 (N.D. Tex. Sept. 10, 2015)

Haas contends Dryshod has presented no evidence of what the relevant market is, no evidence of an antitrust injury, and no evidence of anticompetitive or predatory conduct, and so it is therefore entitled to judgment as a matter of law. (Haas Mot. Summ. J., Dkt. 164-1, at 13). To the extent Dryshod's "real theory is that Haas has engaged in anticompetitive conduct by suing Defendants for copyright and trademark infringement," Haas contends this theory of anticompetitive conduct is barred by the *Noerr-Pennington* doctrine. (Haas, Mot. Summ. J., Dkt. 164-1, at 16).

The Court concurs with Haas. As a prerequisite to Dryshod's restraint of trade claims, Dryshod must define the relevant geographic and product market, which it has failed to do. *See In re Mem'l Hermann Hosp. Sys.*, 464 S.W.3d 686, 710 (Tex. 2015) ("The term 'relevant market' encompasses notions of geography as well as product use, quality, and description."). While Dryshod identifies the relevant market in its response as "the United States camouflage apparel and

---

[6] Texas courts are statutorily instructed to interpret § 15.05 in accordance with § 2 of the Sherman Act, its federal law analogue. *Caller-Times Pub. Co.*, 826 S.W.2d at 580; *see also* Tex. Bus. & Com. Code § 15.04 ("The provisions of this Act shall be construed to accomplish this purpose and shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes to the extent consistent with this purpose."). Accordingly, Texas courts have adopted federal standards for determining § 15.05 violations "including the use of relevant market to determine whether substantial reductions in competition have occurred." *See Apani Sw., Inc. v. Coca-Cola Enterprises, Inc.*, 128 F. Supp. 2d 988, 995 (N.D. Tex. 2001), *aff'd*, 300 F.3d 620 (5th Cir. 2002).

footwear market," (Dryshod Resp., Dkt. 175-1, at 13), Haas does not sell apparel or footwear; "[r]ather, it licenses camouflage patterns and other intellectual property to third-parties who manufacture or sell such goods." (Haas Mot. Summ. J., Dkt. 164-1, at 14). Moreover, this definition of the relevant market is inconsistent with Dryshod's definition of the relevant market in Dryshod's amended complaint, which defines the relevant market as "the market for leaf-bark genre hunting camouflage throughout the United States." (Am. Compl., Dkt. 123, at 18). Defining the relevant market is a prerequisite to both Dryshod's monopoly and attempted monopoly claims under § 15.05; absent a proper definition of the relevant market, no reasonable jury could find for Dryshod on its restraint of trade claims and summary judgment for Haas is proper. *Nukote of Illinois*, 2015 WL 13729264, at *9; *see also Miss. River Basin All. v. Westphal,* 230 F.3d 170, 175 (5th Cir. 2000) ("[I]f no reasonable juror could find for the nonmovant, summary judgment will be granted").

Even if the relevant product market were the camouflage footwear and apparel market, Dryshod does not provide sufficient evidence that Haas possesses monopoly power in that market, as required for a successful monopoly claim, or that Haas's market share approaches the level of dangerous probability of achieving monopoly power, as required for an attempted monopolization claim. *See In re Mem'l Hermann Hosp. Sys.*, 464 S.W.3d 686, 710 (Tex. 2015) (listing elements of both claims); *see also Dimmitt Agri Indus., Inc. v. CPC Int'l Inc.*, 679 F.2d 516, 521 (5th Cir. 1982) ("It requires no great familiarity with the law of antitrust to know that evidence of a defendant's market share is the principal tool used by courts to determine the existence of monopoly power."). As evidence of Haas's market share, Dryshod merely points to select Haas marketing materials. (Dryshod Resp, Dkt. 175-1, at 13). But nowhere in these marketing materials does Haas claim it has a 37.1% market share. (*See* Haas Marketing Materials, Dkt. 175-12, at 1–33). The percentage comparisons identified by Dryshod appear to compare MOSSY OAK, REALTREE and an anonymous "OTHER" camouflage pattern, but it is unclear what these figures represent, and

Dryshod does not offer any evidence other than its conclusory assertion that this percentage is intended to capture market share.[7] (*See id* at 30; *see also* Dryshod Resp., Dkt. 175-1, at 13).[8] And Dryshod cites to no case law indicating why the Court should construe promotional statements like "most popular," "best -selling," or "America's #1 Camo Brand" as evidence of market share, let alone evidence of Haas's dominant market share. (*See* Dryshod Resp., Dkt. 175-1, at 13–14).

Dryshod further fails to provide evidence that Haas engaged in predatory or anticompetitive conduct with a specific intent to monopolize, two essential showings in an attempted monopolization claim. *Surgical Care Ctr. of Hammond*, 309 F.3d at 839. Essentially, Dryshod's predatory conduct argument boils down to an allegation that Haas's dominance in the camouflage market forces small camouflage makers to enter into licensing agreements with Haas for fear of being sued by Haas, which "cuts back on competition in the camouflage market." (Dryshod Resp., Dkt. 175-1, at 15). As support, Dryshod points to Haas's "history of suing small camouflage makers" and the cease and desist letter Haas sent to Dryshod. (Dryshod Resp., Dkt. 175-1, at 14).

But as Haas rightly notes, Dryshod does not discuss the merits of any of these cases (which Haas contends "involved legitimate infringement") or why the *Noerr-Pennington* doctrine does not apply. (Haas Reply, Dkt. 207, at 6). And while there is an exception to the *Noerr-Pennington* doctrine

---

[7] Indeed, Dryshod appears to concede it has no evidence other than Haas's marketing materials to bolster its conclusory allegations of market dominance. (*See* Dryshod Resp., Dkt. 175-1, at 14). For instance, Dryshod notes that because "Haas has refused to provide any sales or revenue information for the license and use of its camouflage patterns and trademarks," Dryshod has had to "rely on public statements by Haas about how they are the number one camouflage brand and how vast their monopoly spans." (Dryshod Resp., Dkt. 175-1, at 14).

[8] As noted previously, Dryshod's pleadings inconsistently define the relevant market. In its First Amended Complaint, Dryshod appears to identify the relevant market as "the market for leaf-bark genre hunting camouflage throughout the United States." (Am. Compl., Dkt. 123, at 28). But in its response to Haas's motion for summary judgment, Dryshod defines the relevant market as "the United States camouflage apparel and footwear market." (Resp., Dkt. 175-1, at 13). Moreover, the percentage comparisons appear to refer only to the MOSSY OAK camouflage pattern. Without defining the relevant market, Dryshod's reference to the 37.1% figure for the MOSSY OAK pattern—unlinked to geographic area and isolated to one camouflage pattern—is even less probative.

for "sham" litigation to cover up anticompetitive activity, Dryshod does not present evidence as to the merits of these cases so as to show, as required under the sham-litigation exception, that the lawsuits initiated by Haas were "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits."[9] *Constr. Cost Data, LLC v. Gordian Grp., Inc.*, No. CV H-16-114, 2017 WL 2266993, at *5 (S.D. Tex. Apr. 24, 2017), *report and recommendation adopted*, No. 4:16-CV-114, 2017 WL 2271491 (S.D. Tex. May 22, 2017) (citing *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993)). Dryshod presents no evidence that Haas has engaged in sham litigation. Instead, it recycles its assertion of fraud on the Copyright Office, which the Court need not address again.

Toxey Haas's statements likewise do not raise a fact issue with respect to noncompetitive conduct or "make clear that Haas intends on monopolizing the camouflage market by forcing small camouflage makers to either take a license from them, or suffer from huge costs of litigation," as Dryshod claims. (Dryshod Mot. Summ. J., Dkt. 175-1, at 14). Read in context, Toxey's statements refer only to the cease and desist letter sent to Dryshod and Toxey's expectation that, in light of what he saw as blatant infringement, Dryshod would comply with the cease and desist letter. (*See* Toxey Haas Dep., Dkt. 175-3, at 7). He says nothing about forcing Dryshod to take a license; rather, Toxey recounts hoping the dispute would work itself out "before things escalat[ed]." (*Id.*). Nor are these statements probative of some broader, predatory, or anticompetitive conduct with respect to the relevant market because they refer to one cease and desist letter sent to the opposing party in this case. *See id.*

---

[9] Moreover, this Court found at the motion to dismiss stage, that Haas had plausibly statement a claim for trademark and copyright infringement against Dryshod. (Order, Dkt. 141).

Absent such evidence, no reasonable jury could find that Dryshod has monopolized or attempted to monopolize the camouflage market. Haas is accordingly entitled to summary judgment on Dryshod's restraint of trade claim as a matter of law.

### 3. Defamation

To prevail on a claim for defamation under Texas law, Dryshod must show "(1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages, in some cases." *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015). The status of the person who was allegedly defamed determines the requisite degree of fault; where a cause of action involves a private individual—as here—Dryshod need only prove Haas made the statements with at least negligence as to its falsity. *Id.* Unless Dryshod can show Haas's allegedly defamatory statements constitute defamation per se, Dryshod must also prove damages. *Id.*

"A statement constitutes defamation *per se* if it "injures a person in his office, profession, or occupation." *Hancock v. Variyam*, 400 S.W.3d 59, 66 (Tex. 2013). Determining whether a statement is defamatory per se "is first an inquiry or the court." *Id.* If the court determines that an ordinary reader could only view the statement as defamatory and further concludes that the statement is defamatory *per se*" summary judgment is inappropriate. *Id.* "Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible [,] the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017), *as revised* (July 5, 2017). That is, if Dryshod can explain how the evidence of an otherwise inadmissible statement could be put into an admissible form at trial, the court may consider that evidence on summary judgment. *See id.*

Dryshod contends Haas—through its salespersons—has published false statements about its Dryshod-branded footwear and that these statements damaged their reputation and exposed the

company to financial injury. (Am. Compl., Dkt. 123, at 29). Dryshod further alleges that Haas made these statements with at least negligence as to their truth. (*Id.*).

Haas argues it is entitled to judgment as a matter of law on Dryshod's defamation claim because the evidence Dryshod has provided of Haas's allegedly defamatory statements is inadmissible hearsay, and, even if it were admissible, Dryshod has not shown any statements made by Haas were actually defamatory, made with the requisite intent, or resulted in damages. (Haas Mot. Summ. J., Dkt. 164-1, at 24–27).

Dryshod contends summary judgment in Haas's favor is inappropriate because it has "ample evidence of defamation per se under Texas common law," which does not require proof of damages. (Dryshod Resp., Dkt. 175-1, at 16). Specifically, Donahue points to statements made to senior buyers at Bass Pro Shops/Cabela's and to Dryshod's transfer-film printing company in China that discredited Donahue and his profession. (Dryshod Resp., Dkt. 175-1, at 17). As evidence of such statements, Dryshod identifies an email from Andy Sircy, a buyer for Bass Pro Shops, to Dryshod's distributor that states "Mossy Oak was in the building last week and mentioned that there might be some issues with the camo you are using on your boots. Anything we should be worried about?" (Bass Pro Email, Dkt. 175-18, at 3). Dryshod argues that the referenced statement made by a Haas employee "caused Bass Pro Shops to put an immediate hold on purchasing decisions for Dryshod products because Mr. Donahue's reputation was put in question." (Dryshod Resp., Dkt. 175-1, at 17). As evidence of the allegedly defamatory statements made to Dryshod's transfer-film company, Dryshod alleges "a Haas employee who frequently traveled to China to inspect factories printing fabrics for Haas' licensees, told Brilliant Shang ("Shang") [an employee of a printing company used by Dryshod] that he should stop printing the Dryshod camouflage pattern because it was an 'illegal copy.'" (*Id.* at 18). Believing these statements,

Shang temporarily refused to print Dryshod's camouflage pattern during "a critical production run for Dryshod goods."[10] (*Id.* at 18–19).

Haas is entitled to summary judgment on Dryshod's defamation claim because the only evidence proffered by Dryshod of the allegedly defamatory statements is inadmissible hearsay. The email from a Bass Pro buyer to Dryshod's distributor paraphrasing what a Haas employee allegedly said is hearsay within hearsay and both levels must satisfy an exception to be admissible. (*See* Bass Pro Email, Dkt, 175-18, at 2–3)); *Warren v. Fed. Nat'l Mortg. Ass'n*, 932 F.3d 378, 387 (5th Cir. 2019). Even if the alleged statement from the Haas employee could be excluded from the hearsay rule as an opposing party admission by an employee acting within her scope of employment, Dryshod has not established that the Haas employees made these statements while acting within the scope of their employment. Likewise, the second allegedly defamatory statement, translated for Donahue by Pepei about what another Haas employee said to another textile worker—a statement Donahue only learned about from Peipei—is inadmissible for the same reason.[11]

While Dryshod insists it has "listed a number of witnesses on its initial disclosures that it may call at trial to support the [defamation] allegations against Haas," it does not name them or cite to any deposition testimony indicating what this testimony will say. To survive summary judgment, Dryshod must present evidence that creates a genuine dispute of material fact on its defamation claim; it cannot refer to ambiguous witnesses and their anticipated testimony to avoid summary judgment. Though the Court may consider the content or substance of otherwise inadmissible materials where the party submitting the evidence shows that it will be possible to put the

---

[10] Shang resumed printing Dryshod's camouflage pattern after Donahue provided him with an executed written certification that Dryshod was not using Haas' copyrighted patterns. (Dryshod Resp., Dkt. 175-1, at 18).

[11] Donahue concedes that he does not know exactly what was said because he heard about the alleged incident through his translator. (Dkt.175-19 at 12 ("[T]his is all in Chinese, so I don't know exactly what was said.").

information into an admissible form at trial, Dryshod merely refers to a set of unnamed witnesses who could testify to the substance of the allegedly defamatory statements. *See* Dryshod Resp., Dkt. 175-1, at 19 ("Dryshod has listed a number of witnesses on its initial disclosures that it may call at trial to support the allegations against Haas, including Dryshod's distributors. Haas has also identified certain witnesses that Dryshod may rely on to present testimony relevant to it [sic] case for defamation per se.").

Because Dryshod's defamation claim is not supported by admissible, competent summary judgment evidence, it is insufficient to establish a fact question and Haas is entitled to judgment as a matter of law on Dryshod's defamation claim.

### 4. Tortious Interference with Existing Business Relations

In its amended complaint, Dryshod contends Haas tortuously interfered with existing business relationships between Dryshod and its distributors. (Am. Compl., Dkt. 123, at 27). In its response to Haas's motion for summary judgment on this cause of action, Dryshod also argues that Haas tortuously interfered with an oral contract[12] between Dryshod and its distributors, CFD and Team J. (Dryshod Resp., Dkt. 175-1, at 20).

As a preliminary matter, the parties dispute whether Texas recognizes a cause of action for tortious interference with existing business relations after the Texas Supreme Court's decision in

---

[12] To prevail on a claim for tortious interference with an existing contract, Dryshod has to present evidence that Haas induced CFD and Team J, Dryshod's exclusive distributors, to breach their alleged "oral contract" with Dryshod. (Dryshod Resp., Dkt. 175-1, at 21); *El Paso II*, 518 S.W.3d 412, 421–22 (Tex. 2017). Failure to allege a specific contract warrants dismissal. *See Serafine v. Blunt*, 466 S.W.3d 352, 361 (Tex. App.—Austin 2015, no pet.) (dismissing plaintiffs' tortious interference claim where they "did not provide detail about the specific terms of the contract or attach to his affidavit any contract or other document memorializing any agreement"). Dryshod acknowledges that Dryshod, CFD, and Team J never reduced their agreement to writing, but insists that an oral contract exists. Even if Dryshod could establish that this oral agreement constituted a binding contract, it does not identify the specific terms of the contract or how Haas's conduct induced CFD and Team J to breach that alleged agreement.

*El Paso Healthcare Sys., Ltd. v. Murphy*, 518 S.W.3d 412, 415 (Tex. 2017) ("*El Paso II*") ("Texas law

recognizes two types of tortious-interference claims: one based on interference with an *existing

contract* and one based on interference with a *prospective* business relationship.") (emphasis added).

The Court need not weigh in on this dispute because Dryshod has failed to produce competent

summary judgment on tortious interference elements common to both types of claims. *Prudential

Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000) (noting the four elements of

tortious interference with an existing contract as: (1) an existing contract subject to interference, (2)

a willful and intentional act of interference with the contract, (3) that proximately caused the

plaintiff's injury, and (4) caused actual damages or loss); *Montoya v. San Angelo Cmty. Med. Ctr.*, No.

03-16-00510-CV, 2018 WL 2437508, at *9 (Tex. App. May 31, 2018), *review denied* (Dec. 14, 2018)

("For purposes of this opinion, we will assume without deciding that Texas recognizes such a claim

and that its elements are: (1) the existence of an existing business relationship that is subject to

interference and (2) a willful and intentional act of interference that (3) proximately causes the

plaintiff's injury.").

First, Dryshod's identifies Haas's decision to file its lawsuit in the lead case and to serve

subpoenas on Dryshod's subpoenas as the basis for its tortious interference claim. (*See* Dryshod

Resp., Dkt. 175-1, at 23). Specifically, Dryshod asserts that "[a]s a result of Haas' interference and

overt threats to enjoin the Dryshod distributors in these lawsuits, the distributors have suspended

original plans to have Mr. Donahue visit key-account customers or attend trade shows to promote

the Dryshod brand and share his story as the originator of both Muck Boot Company and

Dryshod." (*Id.*). Dryshod's summary judgment evidence further narrows the scope of Dryshod's

tortious interference claim to Haas's lawsuit and subpoenas.[13] (*See* Dryshod Resp., Dkt. 175-1, at 22

---

[13] To the extent Dryshod also bases its tortious interference claim on the allegedly defamatory statements
made by Haas employees, the Court has already determined that Dryshod has failed to raise a triable issue in
this cause of action. *See supra* Part III.B.3.

(citing Donahue Dep., Dkt. 175-19, at 8, 11). For instance, when asked what basis he had for believing that Haas intended to sue the Dryshod distributors, Donahue stated "Because you went so hard on them with your subpoenas. And it was unnecessary." (Donahue Dep., Dkt. 175-19, at 8). This evidence is insufficient to establish that Haas acted intentionally or maliciously, as required for tortious interference.

Moreover, Dryshod fails to provide competent evidence of damages. When asked about the damages resulting from Haas's alleged interference, Donahue asserted that his distributors "don't want to associate with me at all anymore," but then conceded that they have continued to order product from him and that their orders have in fact increased, just "[n]ot to where they should be." (*Id.*). As to what these numbers should be, Donahue offered only subjective speculation: "Personally, I think they should be—well, the camouflage numbers are not where they should be at all. Not at all." When asked more specifically about figures, Donahue stated "I think the sales of our camo product probably would have been 35 to 40 percent. It's only about 14%." (*Id.*) Again, Donahue provided no basis for this except that this is "about what [Muck Boot] was selling." (*Id.*). When pressed again about "the quantification of damages arising out of the tortious interference," Donahue said "I don't have a specific number for you. It's going to be substantial." (*Id.* at 175-19, at 8). Such speculation is insufficient to survive summary judgment on the damages prong.[14] *Small Bus. Assistance Corp. v. Clear Channel Broad., Inc.*, 210 F.3d 278, 280 (5th Cir. 2000) (determining that no evidence supported the damages element of a tortious interference claim because the proffered proof was speculative.).

Aside from Donahue's testimony, Dryshod puts forth no other evidence pertaining to damages. (*See* Resp., Dkt. 175-1, at 22–23). Because Dryshod fails to put forth competent summary

---

[14] Moreover, as U.S. Magistrate Judge Lane held in granting Haas's motion to exclude Donahue as an expert witness, Donahue "cannot be an expert on his company's on damages." (Order, Dkt. 220, at 7).

judgment evidence on key tortious interference elements, no reasonable jury could find Haas tortuously interfered with either an existing contract or its existing business relations. Haas is entitled to judgment as a matter of law on this claim.

5. Genericness

Haas also seeks summary judgment on Dryshod's counterclaim in the lead case, predicated on the purported genericness of the "Break-Up" mark. (Haas Mot. Summ. J., Dkt. 164-1, at 29). Dryshod argues that because "the phrase 'break up' is a generic term used to describe the action and effect of a specific type of camouflage" and "commonly refers to a specific type of camouflage pattern—one that uses disruptive coloration—as 'break up,'" all of Haas's Break-Up registrations are not entitled to trademark protection. (Answer, Dkt. 130, at 10-13). Dryshod, the party who bears the burden of proof on this counterclaim at trial, must establish all the essential elements of its claim that warrant judgment in its favor. *See Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002).

As discussed previously, a *generic* term "identifies a genus or class of things or services, of which the particular item in question is merely a member." *Xtreme Lashes*, 576 F.3d at 232. In assessing genericness, the court may consider: "uncontested generic use by competitors, generic use by the plaintiff, dictionary definitions, media usage, testimony of persons in the trade and consumer surveys." *See* J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 12:13 (4th ed. 2010). "Generic terms receive no trademark protection, while descriptive terms merit protection only if they have secondary meaning." *Id.* at 227. A *descriptive* term, on the other hand, "identifies a characteristic or quality of an article or service, such as its color, odor, function, dimensions, or ingredients." *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 539 (5th Cir. 2015). In other words, a descriptive term "provides an attribute or quality of a good." *Xtreme Lashes, LLC,*

576 F.3d at 227. To survive summary judgment then, Dryshod, the party bearing the burden of proof at trial, must make a showing sufficient to establish that the Break-Up mark is generic.

As evidence that the term "Break-Up" is generic, Dryshod cites to "brochures, articles, statements and advertisements that discuss how camouflage is meant to 'break-up your outline.'" (Dryshod Resp., Dkt. 175-1, at 24 (citing to Mossy Oak Story Advertisement, Dkt. 175-28, at 3 ("These Mossy Oak patterns not only blend into your natural surroundings, but also break your outline."); Interview with Toxey Haas, Dkt. 175-29, at 2 ("[The Break-Up pattern] was built on the goal of literally 'breaking up' the outline of a hunter by using naturally contrasting elements."))).

Haas is right that Dryshod's arguments in support of genericness actually militate in favor of descriptiveness. (Haas Reply, Dkt. 207, at 12).  Dryshod's evidence of genericness consists of statements in Mossy Oak advertisements that describe a function or attribute of the camouflage pattern. In other words, the term "Break-Up" describes what the pattern does: break up one's outline. (*See, e.g.*, Mossy Oak Story Advertisement, Dkt. 175-28, at 3; Interview with Toxey Haas, Dkt. 175-29, at 2). And, as Haas further notes, Dryshod has "introduced no use of the term' Break-Up' as part of a third party's mark nor have they introduced wide-spread use of the term Break-Up as a genus of a product." (Haas Reply, Dkt. 207, at 12). Indeed, when asked whether he could name another camouflage pattern that uses the word "Break-Up," Donahue could not. (Donahue Dep., Dkt. 164-9, at 44).

Because Dryshod, the party bearing the burden of proof on its counterclaim at trial, fails to make a showing sufficient to establish the genericness of the Break-Up mark, Haas's motion for

summary judgment as to Dryshod's counterclaim of genericness should be granted.[15] *See Jarabes Veracruzanos, Inc. v. Productora de Alimentos Mexicanos, S.A. de C.V.*, No. SA-14-CA-00466-FB, 2016 WL 7486367, at *7 (W.D. Tex. Feb. 9, 2016), *report and recommendation adopted sub nom. Jarabes Veracruzanos, Inc. v. Productora de Alimentos Mexicanos*, No. SA-14-CA-466-FB, 2016 WL 7486368 (W.D. Tex. Apr. 8, 2016) (finding same).

### 6. Punitive Damages

Finally, Haas moved for summary judgment on Dryshod's punitive damages demand, predicated on its contention that Haas filed a copyright infringement lawsuit with the intent of harming a competitor. Dryshod has provided no evidence to raise a triable fact issue on this question; indeed Dryshod does not even address the punitive damages issue in its response to Haas's motion. (*See* Dryshod Resp., Dkt. 179-41, at 9). Accordingly, the Court will grant summary judgment in Haas's favor.

## IV. CONCLUSION

For these reasons, **IT IS ORDERED** that Dryshod's motion for summary judgment, (Dkt. 158, 194[16]), is **DENIED**.

---

[15] "Proof of the registration of a mark with the PTO constitutes prima facie evidence that the mark is valid and that the registrant has the exclusive right to use the registered mark in commerce with respect to the specified goods or services." *RJ Mach. Co. v. Canada Pipeline Accessories Co.*, 116 F. Supp. 3d 795, 808 (W.D. Tex. 2015) (citing *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 237 (5th Cir. 2010). The challenged marks are registered with the U.S. Patent and Trademarl Office and are therefore entitled to this presumption, and Dryshod has not sufficiently rebutted this presumption with a showing that the marks are not inherently distinctive. *See id.*

[16] Redacted copy.

**IT IS FURTHER ORDERED** that Haas's motion for summary judgment, (Dkt. 163), is

**GRANTED**.

**SIGNED** on February 4, 2020.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE