# EXHIBIT C

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| HAAS OUTDOORS, INC.,<br><br>        Plaintiff,<br><br>v.<br><br>DRYSHOD INTERNATIONAL, LLC<br>and JAMES K. DONOHUE,<br><br>        Defendants. | Civil Action No. AU:18-cv-00978-RP |

## DEFENDANTS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

Defendants Dryshod International, LLC and James K. Donohue submit these proposed findings of fact and conclusions of law. Any findings of fact the Court also deems appropriate as conclusions of law are proposed as such, and vice versa.

## I.    Introduction

This is a copyright and trademark dispute involving camouflage patterns and products. Plaintiff Haas Outdoors, Inc. accuses Defendants Dryshod International, LLC and its co-owner James K. Donohue (together, "Dryshod") of copying a piece of camouflage pattern artwork owned and copyrighted by Haas. Separately, Haas asserts trademark infringement arising from Dryshod's use of the name MOBU on select products from approximately October 2017 through June 2018.

The Court held a non-jury trial in October 2021. Having considered the evidence presented at trial and the applicable law, the Court concludes that Haas has

1

not met its burden to prove either copyright infringement or trademark infringement by a preponderance of the evidence.

## II.   Findings of Fact

### A.   Haas and its alleged IP

Haas designs camouflage patterns for use on apparel and other products. Rather than manufacture its own products, Haas' primary business is licensing others to manufacture and sell products bearing Haas' patterns. Haas' license agreements typically contain a schedule identifying the specific intellectual property being licensed. This licensed intellectual property may include copyrights covering Haas' camouflage pattern artwork, trademarks for brand names and logos used by Haas to indicate source, or both.

Haas' claims against Dryshod arise from one copyright and three alleged trademarks. The copyright at issue covers a work of visual art registered by Haas with the U.S. Copyright Office under the title NEW BREAK-UP.[1] The registration number is VAu 542-518 and bears an effective date of December 21, 2001. The copyrighted work of visual art, as filed with the Copyright Office, is pictured on the next page:

---

[1] A copyright applicant may list a title for the work. The title is merely an identifier for the work and does not receive copyright protection. *See* 37 C.F.R. § 202.1(a).



**Fig. 1: NEW BREAK-UP Work of Visual Art (as registered)**

Haas' trademark claims involve three alleged marks. The first alleged mark, MOBU, is not used by Haas. Haas does not advertise, market, offer, or sell any goods or services under MOBU. Haas owns no trademark registration for MOBU and has never applied to register that mark. None of Haas' license agreements identify MOBU as one of the trademarks being licensed. Until this dispute, Haas had never asserted trademark rights in MOBU against anyone.

Nonetheless, Haas claims to own MOBU as a trademark. Haas advances two theories supporting this claim of ownership. First, because some of Haas' licensees occasionally use MOBU in the SKU number or color code for some of their products— apparently on their own initiative, as Haas neither requires nor encourages this— Haas posits that those licensees' use inures to Haas' benefit as the licensor. Second, Haas asserts rights in MOBU under the so-called "public use doctrine" in trademark law. The Court addresses the legal merits of these two theories below in its conclusions of law.

The other two Haas marks at issue are MOSSY OAK and BREAK-UP. MOSSY OAK is the primary brand name under which Haas publicly operates, and BREAK-UP is a name Haas uses in several variations to identify certain of its camouflage patterns. Unlike MOBU, which Haas does not use in commerce, it is undisputed that Haas uses each of these two separate marks in commerce. It is also undisputed that Haas owns federal registrations for each as separate marks, though none of Haas' registrations cover both marks together. Further, none of Haas' registrations for BREAK-UP or MOSSY OAK cover footwear or boots.

4

### B.       Dryshod and its distributors

Dryshod is owned and operated by husband and wife James and Maureen "Mimi" Donohue.[2] Dryshod designs and manufactures waterproof work boots under the brand name DRYSHOD. Some of Dryshod's boot models have a camouflage pattern, while others do not.

In 1998, the Donohues founded the Muck Boot Company. They sold Muck Boot to Norcross Safety Products in January 2002. The acquisition included a two-year consulting agreement for Donohue, but minimal work was performed under that consulting agreement, and Donohue parted ways with Muck Boot as of April 2002. Honeywell International later acquired Muck Boot in 2008, by which time the Donohues had not been involved with the company for several years.

Donohue was generally familiar with Haas from his time as owner of Muck Boot. In 2001, Donohue had taken a license from Haas on behalf of Muck Boot, though the record does not show which Haas camouflage patterns fell under that license. Donohue did not end up using the Haas license, choosing instead to use licensed patterns from one of Haas' competitors, Realtree. The record shows that Muck Boot first used a Haas-brand camouflage pattern on a boot in its 2005 product line, years after the Donohues sold the company in January 2002. From the time they left Muck Boot until the events leading to this lawsuit in 2017, the Donohues had no dealings with Haas, Honeywell, the hunting industry, or the rubber boot industry.

---

[2] "Donohue" means James Donohue, who is a defendant. "The Donohues" means both James and Mimi Donohue. Mimi Donohue is not a defendant.

In March 2017, two key former distributors of Muck Boot—who had been let go by Honeywell a month earlier—approached Donohue about potentially launching a new venture. They discussed using a similar business model to the one they had successfully used during the Donohues' ownership of Muck Boot from 1998 until January 2002. Under the 2017 model, Donohue would handle all boot design and manufacturing. The distributors would place orders directly with Donohue's factory in China. After receiving the shipments from China, the distributors would handle all distribution, marketing, and sales into the U.S. consumer marketplace. All revenue on wholesale and retail boot sales would go to the distributors; the Donohues' income would come solely from a "sourcing fee" paid by the distributors on each pair of boots shipped from China. The distributors would pay the factory directly, with the Donohues having no ownership of any production boots shipped to the distributors.

Donohue and his wife eventually agreed to this proposal, leading to the formal creation of the Dryshod business.

## C.    Dryshod's development of the accused camouflage pattern

The distributors tasked Donohue with developing the initial Dryshod product concepts starting in April 2017. The product plan included boots for the hunting category, some of which would have camouflage patterns. One of the distributors, who had previously held a license from Haas, asked Donohue to contact Haas to see if the license was still active. Heeding this request, Donohue found Haas' contact information online and contacted them to ask about the status of the distributor's license. Haas told Donohue they could not divulge that information, but suggested he submit an application for a new license. Donohue did so on April 17, 2017. In addition

to their interest in a possible license from Haas, Donohue and the distributors also discussed seeking licenses from two other camouflage pattern providers, True Timber and Realtree.

Around this same time, Dryshod began exploring a second path for developing introductory camouflage boot models—a path that would not require any license. In May 2017, Dryshod commissioned a freelance artist named Scott Hewett to create an original piece of camouflage pattern artwork specifically for Dryshod's use. Dryshod paid Hewett $2,000. The original artwork created by Hewett, which he painted on canvas and mailed to Donohue around June 7, 2017, is pictured below:



**Fig. 2: Hewett Original Dryshod Artwork (on canvas)**

Donohue initially planned to take Hewett's final canvas painting to China on a scheduled trip in early June 2017. However, Hewett did not finish the canvas painting in time. Needing something for the China trip, Donohue took a rough draft of Hewett's artwork—which Hewett had emailed to Donohue in late May—and attempted to recreate Hewett's artwork by arranging some leaves, twigs, and bark gathered from Donohue's yard near Austin, Texas. Donohue then took a photo of the arrangement using his iPhone, which is shown below:



**Fig. 3: Donohue's Backyard iPhone Photo**

Around June 10, 2017, while in China, Donohue provided this iPhone photo to the computer-graphics vendor at the textile printing factory. The graphics vendor used Donohue's iPhone photo to create a "repeating" version of the photo suitable for printing on fabric as a camouflage pattern. Donohue then presented a pattern swatch on a boot sample to the two distributors at a July 10, 2017 meeting in Austin.

Paired with the idea of using a special waterproof fabric coating called HYDROKOTE® on the boots,[3] the distributors encouraged Donohue to proceed with developing this "DIY" pattern, based on Donohue's iPhone photo, for the introductory Dryshod product line. Donohue then worked with Dryshod's Chinese vendors from August through October 2017 to finalize the DIY pattern. The final factory-ready version of the pattern is shown below (the "Dryshod DIY Pattern"):

---

[3] Donohue owns a federal registration for HYDROKOTE covering "[w]ater repelling footwear." U.S. Reg. No. 5,513,646.



**Fig. 4: Dryshod DIY Pattern (on fabric)**

While creating the Dryshod DIY Pattern, Dryshod also continued exploring in parallel possible licenses from established camouflage brands. Donohue submitted a licensing application to True Timber, one of Haas' competitors, on June 9, 2017. After Haas went silent on Donohue's first licensing application submitted in April 2017, the parties reconnected in June 2017. Donohue submitted an updated licensing application to Haas on June 27, 2017. In anticipation of potentially securing the Haas license, Donohue told his vendor in China that it could create "look-see" prototype boots using some leftover Haas fabric that was sitting unused in the factory, though Donohue instructed the vendor in to do this only "if necessary." Donohue had asked Haas in his April 2017 emails for permission to create the "look-see" prototypes, which he noted would be used only internally to show the distributors, not for public sales or marketing. He reiterated that request for permission in an email to Haas on June 28, 2017, after the parties had reconnected.

On July 3, 2017, Haas replied expressly granting Dryshod permission to create the requested look-see prototypes with the unused Haas fabric. The parties had yet to agree on any license, and as of that date, Haas had not even sent a license agreement to Dryshod. Three days later, Haas emailed a proposed license agreement to Dryshod for review. The parties did not end up signing the agreement. Notably, the proposed agreement from Haas listed several licensed copyrights and trademarks, but these did not include either the copyrighted NEW BREAK-UP artwork or the alleged trademark MOBU.

Dryshod's two parallel tracks of development for its introductory products—the licensing track and the non-licensing track using the Dryshod DIY Pattern—ended after the July 10 distributor meeting in Austin. While Dryshod and the distributors discussed the benefits of licensing from an established camouflage-pattern provider, they also shared several concerns about the strict requirements a license would impose. For example, Haas wanted Dryshod (not the distributors) to sign as the licensee, but Haas' proposed license agreement contained accounting obligations that would have required the distributors' books, to which Dryshod had no access. As another example, Dryshod and the distributors worried that operating under a license would make it competitively unwise, logistically difficult, and significantly more expensive for the factory to apply the Dryshod boots' special waterproofing compound, HYDROKOTE. Dryshod shared many of these concerns with Haas at various points, but Haas offered no ideas or solutions.

Ultimately, Dryshod and the distributors concluded that their concerns outweighed the benefits of a license. They decided to greenlight boot production under the non-licensing track using the Dryshod DIY Pattern, and Donohue instructed the factory accordingly in September 2017. Later in the year, Haas followed up to ask whether Dryshod was still interested in taking a license. Donohue responded that Dryshod had decided to "pass on adopting Mossy Oak (or any other licensed camo brand) for the initial DRYSHOD product line," reiterating the same concerns Dryshod had previously discussed with the distributors or raised with Haas to no avail.

At trial, Haas questioned Donohue's and the distributors' credibility about development of the Dryshod DIY Pattern and the decision to move forward with that pattern for the introductory boot models. However, the Court finds their testimony credible. The Court also finds that their testimony tracks with contemporaneous emails and other documents put into evidence.

### D.    Dryshod's use of MOBU

Early in development, Donohue conceived the product name MOBU for use on some of Dryshod's introductory boot models. The MOBU product name would appear alongside the main brand name DRYSHOD, consistent with how Dryshod generally presents its boot models. The image below shows an example of one of Dryshod's MOBU MAX boots bearing both that product name and the DRYSHOD brand name:



**Fig. 5: Dryshod MOBU MAX Boot**

13

Before adopting the MOBU product name, Donohue searched for conflicting marks on the federal register. Finding none, he applied to register MOBU with the U.S. Patent and Trademark Office (PTO) on October 21, 2017. U.S. Ser. No. 87/654,588. That initial application suffered from a technical issue with the goods identification, causing Donohue to file a new application for MOBU on January 31, 2018. U.S. Ser. No. 87/778,784. The second application identified the goods as follows: "[f]ootwear; [w]aterproof footwear." The application was allowed by the PTO, which likewise found no conflicting marks. Haas opposed the application after the PTO allowed it. That opposition has been suspended pending the outcome of this action.

Because Donohue conceived the MOBU product name early on, he considered it important that the name be ambiguous and flexible enough to make sense on multiple product-development tracks. With respect to the non-licensing track using the Dryshod DIY Pattern, Donohue suggested to the distributors that they could market MOBU as meaning "My Own Break Up," a reference to the functional effect of camouflage apparel on the wearer.[4]  On the licensing track with Haas, Donohue felt that the MOBU name could still potentially work if people interpreted it as meaning "Mossy Oak Break-Up," assuming Haas signed off on that idea as the licensor. Donohue believed that the MOBU name would not make sense if Dryshod licensed from True Timber or Realtree, as neither of these concepts would apply.

---

[4] Specifically, camouflage apparel works to "break up" the wearer's outline against the background. The Court heard credible evidence on this point from several sources, including from Haas itself. Thus, while BREAK-UP is indisputably a registered mark belonging to Haas, the Court finds that the term also simultaneously carries this common and functional meaning for camouflage.

At trial, Haas sought to cast doubt on Dryshod's reasons for selecting the MOBU name. However, the Court finds Donohue's testimony credible. Though Donohue recognized that MOBU could potentially be interpreted as meaning "Mossy Oak Break Up," the Court does not find that he conceived the name with any intent to create an association with Haas or otherwise to confuse consumers. Rather, Donohue considered the MOBU name attractive precisely because of its ambiguous meaning and its flexibility to work within multiple product-development tracks.

In any event, Dryshod's use of the MOBU product name was fairly short-lived. Dryshod's factory shipped boots bearing the MOBU name to the distributors from October 22, 2017 until December 24, 2017. In February 2018 and under the threat of this lawsuit, Donohue offered to remove MOBU, hoping this would alleviate Haas' concerns. Haas did not respond to that offer, but Dryshod nonetheless honored it and removed MOBU from the boots at the factory by March 16, 2018. The factory then used up a limited inventory of fabric containing the MOBU watermark on a few more purchase orders from the distributors, the last of which shipped in June 2018.

### E.   Third-party camouflage patterns

At trial, Dryshod put into evidence several examples of third-party camouflage patterns that, like Haas' NEW BREAK-UP pattern and the Dryshod DIY Pattern, are all in the "leaf-bark" camouflage genre. The Court viewed physical specimens of these third-party patterns at trial. The photos below show a few examples of the third-party patterns in evidence:



**Fig. 6: Examples of Third-Party Camouflage Patterns**

### F.     Sales of Dryshod's accused products

Through August 31, 2021, Dryshod's factory processed orders from Dryshod's distributors for a total of 948,764 pairs of boots. Of that total, 137,270 pairs contained the Dryshod DIY Pattern only. An additional 8,952 pairs contained both the Dryshod DIY Pattern and the product name MOBU. Thus, as of August 31, 2021, Dryshod processed orders for 146,222 pairs of boots accused of copyright infringement and 8,952 pairs accused of both copyright and trademark infringement.

Despite these substantial numbers, Haas produced no evidence at trial of any actual consumer confusion. In addition, Haas produced no evidence of anyone outside of Haas—consumer or otherwise—believing or stating any belief that the Dryshod DIY Pattern looks similar to Haas' NEW BREAK-UP pattern.

### G.     Haas' demand letter and Dryshod's response

On January 10, 2018, Haas' outside counsel sent a demand letter to Dryshod. The letter alleged that Dryshod was infringing "Haas Outdoor's BREAK-UP pattern" and its "MOSSY OAK BREAK-UP® registered trademark." Despite referring to the pattern as "BREAK-UP," the letter provided the copyright registration number for the NEW BREAK-UP artwork.

The same day, Donohue responded to Haas' counsel with a detailed email. Donohue denied Haas' allegations, including specific denials that Dryshod had copied anything or that there would be any consumer confusion. Donohue's email noted several inaccuracies in Haas' letter, including the statement that "MOSSY OAK BREAK UP®" is a registered trademark. Donohue also invited Haas to call him. When Haas did not respond, Donohue reiterated that invitation a few days later.

Dryshod received no further communication from Haas. Twelve days after sending its demand letter, Haas filed suit.

## III.   Procedural History

Haas initially sued Dryshod in this Court on January 22, 2018. It voluntarily dismissed that action less than a month later and re-filed in the U.S. District Court for the Northern District of Mississippi. Dryshod countersued in this Court in July 2018, seeking declaratory relief and alleging various torts by Haas. The Mississippi action was later transferred to this Court, after which the Court entered an order consolidating the transferred action with Dryshod's countersuit.

Several claims from the parties' pleadings dropped out before trial. The claims on which the parties went to trial included the following: (1) Haas' claim for copyright infringement under the Copyright Act, 17 U.S.C. § 501; (2) Haas' claim for federal trademark infringement under the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a); (3) Haas' claim for common law trademark infringement; (4) Haas' claim for denial of Dryshod's pending application to register MOBU with the PTO, 15 U.S.C. §§ 1052(d) and 1119; and (5) Dryshod's claims for declaratory judgment of copyright and trademark non-infringement.

## IV.   Conclusions of Law

The Court concludes that Haas failed to meet its burden at trial to prove either copyright infringement or trademark infringement. These two conclusions resolve the remaining claims, as discussed below.

## A.      Copyright infringement

The Court first addresses Haas' copyright infringement claim. Haas asserts that Dryshod has infringed its copyrighted work of visual art titled NEW BREAK-UP, Reg. No. VAu 542-518, which is pictured above in Figure 1.

To prove copyright infringement under 17 U.S.C. § 501, a plaintiff must prove each of the following elements: (1) ownership of a valid copyright; (2) factual copying; and (3) substantial similarity. *Armour v. Knowles*, 512 F.3d 147, 152 (5th Cir. 2007); *Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 367–68 (5th Cir. 2004). With limited exceptions not applicable here, only works registered with the Copyright Office can be the subject of a civil action for copyright infringement. 17 U.S.C. § 411(a); *Fourth Estate Pub. Benefit Corp. v. Wall-Street.com*, 139 S. Ct. 881, 887–88 (2019).

In this case, the Court's analysis begins and ends with the third element: substantial similarity. This element requires a "side-by-side comparison" of the copyrighted work to the allegedly infringing work. *Creations Unlimited, Inc. v. McCain*, 112 F.3d 814, 816 (5th Cir. 1997), *abrogated in part on other grounds*, *Reed Elsevier, Inc. v. Muchnic*, 559 U.S. 154 (2010). In making this comparison, the factfinder must determine "whether a layman would view the two works as 'substantially similar.'" *Positive Black Talk*, 394 F.3d at 374 (quoting *Creations Unlimited*, 112 F.3d at 816). The substantial-similarity requirement reflects a basic copyright law principle that, even in cases where factual copying has occurred (which is not this case), "[n]ot all 'factual' copying constitutes legally actionable copyright

infringement." *Creations Unlimited*, 112 F.3d at 816 (citing *Eng'r Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1340 (5th Cir. 1994)).

The Court, sitting as the factfinder, has compared Haas' copyrighted NEW BREAK-UP work to Dryshod's allegedly infringing work. The Court does not find that a layman would view the works as substantially similar. In fact, the Court concludes that the works come nowhere close to meeting this standard. The side-by-side comparison below, which uses Figures 1 and 4, illustrates the point:

 

**Fig. 7: NEW BREAK-UP Artwork vs. Dryshod DIY Pattern**

The comparison above is just one of many side-by-side comparisons the Court considered as the factfinder. Haas presented other comparisons at trial, many of which had questionable relevance given controlling law. *See, e.g.*, *Creations Unlimited*, 112 F.3d at 816 (holding that the proper side-by-side comparison is to the plaintiff's work as registered with the Copyright Office, not the work as shown on the plaintiff's products). Still, the Court has considered all of Haas' proffered comparisons and given them the evidentiary weight they deserve. None of them change the outcome.

Haas' failure to prove substantial similarity is fatal to its copyright claim. However, the Court also concludes that Haas failed to prove factual copying, the second element of copyright infringement.

A plaintiff can prove factual copying with either direct or circumstantial evidence. *Positive Black Talk*, 394 F.3d at 367–68. Because direct evidence of copying is rarely available, a factfinder may infer copying if the plaintiff proves both that the defendant (1) had access to the copyrighted work prior to the creation of the allegedly infringing work, and (2) that the works are probatively similar. *Id.* (citing *Peel & Co. v. Rug Market*, 238 F.3d 391, 394 (5th Cir. 2001)). If the plaintiff successfully makes both showings, this creates a factual inference of copying, which the defendant can rebut by offering evidence that it independently created the work. *Id.* (citing *Peel*, 238 F.3d at 298; *Miller v. Univ. City Studios*, 650 F.2d 1365, 1375 (5th Cir. 1981)).

Haas introduced no direct evidence of copying. It offered some evidence tending to show Dryshod's access to the NEW BREAK-UP work, but the Court need not decide

whether this evidence rose to the level of proving access by a preponderance. This is because, regardless of Dryshod's access, the Court does not find that the works are probatively similar. While the parties' works use the same *idea*—i.e., creating a functional camouflage pattern using elements of nature such as leaves and tree bark—copyright law does not protect ideas. 17 U.S.C. § 102(b); *Harper & Row Publ., Inc. v. Nation Enters.*, 471 U.S. 539, 556 (1985) ("[N]o author may copyright his ideas . . . ."). Indeed, the record contains several examples of third-party camouflage patterns in the "leaf-bark" genre, all of which implement this same idea.

Finally, even if Haas had shown that the works were probatively similar, the Court concludes that Dryshod independently created its work. *See Positive Black Talk*, 394 F.3d at 357 (citing *Peel*, 238 F.3d at 298; *Miller*, 650 F.2d at 1375). The credible testimony of Donohue and the distributors, recounted in detail above, establishes the step-by-step process through which Dryshod created its work using Hewett's original artwork and Donohue's iPhone photo. This credible testimony alone suffices to show independent creation. The Court also notes that the testimony finds ample corroboration in the contemporaneous documents put into evidence.

In sum, Haas has failed to prove copyright infringement on multiple grounds. The claim fails.

## B.     Trademark infringement

The Court now turns to Haas' claims of trademark infringement. Haas asserts that Dryshod's use of the product name MOBU on certain of Dryshod's boots, which spanned from approximately October 2017 until June 2018, infringed Haas' trademark rights.

To prove trademark infringement, a plaintiff must establish: (1) ownership of a legally protectable mark, and (2) a likelihood of consumer confusion between the parties' marks. *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 236 (5th Cir. 2010).[5] On the first element, "[o]wnership of a mark requires a combination of both appropriation and use in trade." *Blue Bell, Inc. v. Farah Mfg. Co.*, 508 F.2d 1260, 1264–65 (5th Cir. 1975) (citing *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90 (1918)).

Here, Haas asserts that Dryshod's use of MOBU infringed Haas' rights in three different alleged marks. First, Haas claims to own the mark MOBU itself. Second, Haas claims infringement of its rights in the separate marks MOSSY OAK and BREAK-UP, respectively. The Court finds no infringement as to any of these three alleged marks, though for different reasons on the first one than the latter two.

### 1.    Haas' alleged mark MOBU

The Court begins with Haas' claim that it owns, and that Dryshod thus infringed, the trademark MOBU. Haas owns no federal registration for MOBU, so it must establish ownership of MOBU as an unregistered trademark (sometimes known as a "common law" trademark). *See Matal v. Tam*, 137 S. Ct. 1744, 1752–53 (2017).

---

[5] The elements of trademark infringement are the same under the Lanham Act and state common law. *Choice Hotels Int'l, Inc. v. Patel*, 940 F. Supp. 2d 532, 538–39 (S.D. Tex. 2013). Also, the Lanham Act infringement elements are the same whether the claim arises under 15 U.S.C. § 1114(1) or § 1125(a). *Id.* However, § 1114(1) requires a "registered mark," while § 1125(a) covers infringement of unregistered marks.

To prove ownership of an unregistered mark, the plaintiff must show that it uses the mark in U.S. commerce. *Id.* at 1752; *Blue Bell*, 508 F.2d at 1264–65 (citing *Theodore Rectanus*, 248 U.S. 90). "[N]either conception of the mark, nor advertising alone, establishes trademark rights at common law." *Blue Bell*, 508 F.2d at 1265 (citations omitted). Rather, the right of ownership in a trademark "belongs to one who first uses it in connection with specified goods." *Id.*; *accord, e.g.*, *Union Nat'l Bank of Tex., Laredo v. Union Nat'l Bank of Tex., Austin*, 909 F.2d 839, 842–43 (5th Cir. 1990); *see also* 15 U.S.C. § 1127 (definitions of "trademark" and "use in commerce").

Haas does not use the mark MOBU in commerce. Normally this sort of fact would end the inquiry. However, Haas offers two theories for why the Court should nonetheless conclude that Haas owns MOBU as a trademark, despite its lack of use in commerce.

For its first theory, Haas points to evidence that some of its licensees use MOBU in their products' SKU codes and color codes. Haas then posits that it can "claim" this occasional use by its licensees, citing the principle that a licensee's use inures to the benefit of the licensor. *See generally Turner v. HMH Publ'g Co.*, 380 F.2d 224, 227 (5th Cir. 1967).

The Court finds this theory problematic for a few reasons. For one thing, the principle that a licensee's use inures to the licensor's benefit presumes that the mark at issue is licensed. Haas introduced no evidence that any of its license agreements— of which Haas has issued thousands over the years—cover MOBU as one of the licensed marks. This fact is particularly significant because Haas' license agreements

each typically contain a detailed schedule listing each individual copyright and trademark being licensed. What's more, until its allegations against Dryshod, the Court heard no evidence that Haas has ever claimed trademark ownership of MOBU in any context, licensing or otherwise.

Further, the licensees using MOBU in their SKU and color codes apparently do so on their own initiative, as Haas neither requires nor encourages this. Haas has provided no authority for the proposition that the seemingly indiscriminate (and potentially inconsistent) display of a mark by certain licensees—of a mark not covered by any of their license agreements, no less—could "count" as use in commerce of that unlicensed mark by the putative licensor. The Court declines to chart new ground by adopting this apparently novel proposition.

Haas' second theory for claiming ownership of MOBU rests on a rarely applied trademark law doctrine, sometimes called the "public use doctrine." *See George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 403 (4th Cir. 2009) (discussing the doctrine but declining to apply it). As construed by Haas, this doctrine stands for the proposition that a plaintiff may claim rights in any mark the public widely uses to reference the plaintiff, even if the plaintiff does not itself use that mark in commerce.

The Court has serious doubts about Haas' construction of this doctrine, both as a matter of law and as applied here. It does not appear that the Fifth Circuit has ever adopted the rule that public use alone can confer trademark rights on a private owner. The closest Fifth Circuit precedent appears to be *Volkswagenwerk Aktiengesellschaft v. Rickard*, 492 F.2d 474 (5th Cir. 1974), but in that case (and

unlike here), the plaintiff itself had used the mark "in its own advertising for many years." *Id.* at 478. Other courts have noted that the public-use doctrine is "extremely limited in scope," *George & Co.*, 575 F.3d at 403, and that it is "doubtful . . . whether a manufacturer can claim protection for an abbreviation of a trademark that it has never formally used," *Cont. Corrugated Container Corp. v. Cont. Grp.*, 462 F. Supp. 200, 204 (S.D.N.Y. 1978).

To the extent courts outside the Fifth Circuit have rarely allowed public use to create private trademark rights, this seems to have happened only when the plaintiff proved that the alleged mark was an extremely famous nickname with widespread and mainstream consumer recognition. *See Johnny Blastoff, Inc. v. L.A. Rams Football Co.*, 188 F.3d 427, 434–35 (7th Cir. 1999) (allowing the Los Angeles Rams football team to claim trademark ownership of ST. LOUIS RAMS); *Coca-Cola Co. v. L.A Brewing Co.*, 44 U.S.P.Q. 190, 192–93 (S.D. Cal. 1939) (allowing the Coca-Cola Company to claim trademark ownership of COKE); *New York Yankees P'ship v. Evil Enters., Inc.*, 2013 WL 1305332, at *4–6 (T.T.A.B. Feb. 8, 2013) (allowing the New York Yankees baseball team to claim trademark ownership of EVIL EMPIRE).

The Court sees little comparison between these precedents and Haas' claim to own MOBU. The sporadic public use of MOBU in the record does not rise to nearly the same level. The Court is mindful of the foundational principle that trademark rights in the U.S. can arise only from use of the mark in commerce. *See supra* pp. 23–24. With no controlling authority creating any exception for so-called "public use," the Court declines on these facts to depart from that principle.

26

In sum, Haas has not shown ownership of the unregistered mark MOBU through use in commerce. The failure to prove ownership defeats Haas' trademark claims based on alleged rights in MOBU.[6]

### 2.   Haas' marks MOSSY OAK and BREAK-UP

Haas also claims that Dryshod's use of MOBU infringed its rights in two separate registered marks: respectively, the marks MOSSY OAK and BREAK-UP. It is undisputed that Haas owns federal registrations for these two separate marks. It is also undisputed that Haas' registrations have obtained "incontestable" status under 15 U.S.C. § 1065. Thus, for these two marks, the Court focuses its analysis on the second element of infringement: the likelihood of consumer confusion.[7]

The Fifth Circuit uses a multifactor test to assess the likelihood of confusion. The eight factors, known as the "digits of confusion," are: (1) the type of mark allegedly infringed; (2) the similarity between the two marks; (3) the similarity of the products or services; (4) the identity of the retail outlets and purchasers; (5) the identity of the advertising media used; (6) the defendant's intent; (7) any evidence of actual confusion; and (8) the degree of care exercised by potential purchasers.

---

[6] The Court has no occasion to address whether, if used in commerce by Haas in the future, MOBU would be legally protectable (i.e., whether it would be a distinctive mark). The parties argued about the mark's distinctiveness at summary judgment, *see* ECF No. 227 at 16–19, but did not re-urge those points at trial. The Court notes that, even for inherently distinctive marks, trademark ownership requires use in commerce. 2 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 16:4 (5th ed. 2019) (citing *Theodore Rectanus*, 248 U.S. at 100); *see also supra* pp.23–24.

[7] The incontestable status of Haas' registrations is irrelevant to evaluating the likelihood of confusion. *See* 15 U.S.C. § 1115(b) (establishing that an incontestably registered mark is still "subject to proof of infringement").

*Springboards to Educ., Inc. v. Hou. Indep. Sch. Dist.*, 912 F.3d 805, 812 (5th Cir. 2019).

These digits are flexible and "'do not apply mechanically to every case.'" *Id.* (quoting *Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 485 (5th Cir. 2004)). The Court has discretion to weigh the digits "differently from case to case, depending on the particular facts and circumstances." *Future Proof Brands, LLC v. Molson Coors. Bev. Co.*, 982 F.3d 280, 289 (5th Cir. 2020) (quotation omitted). Nonetheless, two digits possess "particular prominence": the defendant's intent (digit six), and evidence of actual confusion (digit seven). *Id.* Regardless of which digits carry the day, the plaintiff always bears the burden to prove the likelihood of confusion. *Viacom Int'l v. IJR Capital Inv., LLC*, 891 F.3d 178, 191–92 (5th Cir. 2018).

In this case, the Court focuses on three digits: the second, sixth, and seventh. On the second digit, the Court disagrees with Haas that the parties' marks are similar. Assessing similarity requires consideration of the marks' "appearance, sound, and meaning." *Id.* at 193. MOSSY OAK and BREAK-UP each differ significantly in appearance and sound from MOBU. Even if the Court combines Haas' two separate marks together, as Haas urges, the combined term "MOSSY OAK BREAK-UP" still differs significantly in appearance and sound from MOBU. And these differences become even more stark when the Court compares the parties' marks as they appeared in the actual marketplace—e.g., on actual products, packaging, and marketing. *See Future Proof*, 982 F.3d at 295 (emphasizing that the second digit compares the marks "in the context that a customer perceives them in

the marketplace, which can include labels, packages, or advertising material directed to the goods" (quotation omitted)); *Scott Fetzer*, 381 F.3d at 486 ("[T]he particular context in which the [defendant's] mark appears must receive special emphasis.").

The question of similarity in meaning is slightly more nuanced, but still favors Dryshod. Haas asserts that MOBU stands for "Mossy Oak Break-Up." Donohue acknowledged that the parties could have potentially marketed MOBU that way, had they ended up entering into a license agreement and had Haas approved of the idea. However, it is also clear that MOBU is an ambiguous acronym subject to more than one possible meaning, which was a major part of its appeal for Dryshod in the first place. That Dryshod at one point planned to market the acronym as meaning "My Own Break Up"—not as a reference to Haas, but to the concededly functional "break up" effect of camouflage—illustrates the point.

Also, Donohue's views carry only so much weight because the question is one of *consumer* perception. The Court heard little credible evidence that consumers perceive MOBU as meaning "MOSSY OAK BREAK UP." And more importantly, the Court heard *no* evidence that consumers perceived MOBU in that way when they encountered it in the context of Dryshod's boots in the marketplace, which is the relevant question in the infringement analysis. *See Future Proof*, 982 F.3d at 295; *Scott Fetzer*, 381 F.3d at 486. For these reasons, the Court finds the parties' marks dissimilar, which weighs against a likelihood of confusion.

On the sixth digit, the Court asks whether the defendant "intended to derive benefits from the reputation of the plaintiff." *Future Proof*, 982 F.3d at 296. Mere

knowledge of the plaintiff's marks "does not establish . . . bad intent." *Id.* (citing *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 456 (5th Cir. 2017)).

Though Haas has established that Dryshod may have known about the BREAK-UP and MOSSY OAK marks, it has not shown anything more. For the reasons discussed in the Court's findings above, the evidence fails to show that Dryshod conceived or used the MOBU product name with any intent to derive a benefit from Haas' reputation or to confuse consumers. The sixth digit thus weighs against a likelihood of confusion, or is at worst neutral.[8]

Finally, on the seventh digit, the Court finds highly persuasive that Haas failed to produce any evidence of actual consumer confusion. The Court recognizes that actual confusion is not required to prove a likelihood of confusion. *Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44, 45–46 (5th Cir. 1975). Nonetheless, actual confusion is "the best evidence of likelihood of confusion." *Id.* at 46. And in the specific context of this case, the Court finds the lack of actual confusion evidence telling. Haas contends that Dryshod intentionally selected MOBU to trade off Haas' reputation. Haas also contends that the public widely understands MOBU to mean "Mossy Oak Break-Up." *See supra* Part B.1. If these things are true, one would expect to see a significant amount of actual confusion arising from Dryshod's use of MOBU on camouflage boots, or at least some. Instead, Haas showed none.

---

[8] The Fifth Circuit has noted "inconsistent" language in its precedent about whether the sixth digit can affirmatively weigh against a likelihood of confusion. *Future Proof*, 982 F.3d at 296. The Court does not opine on that issue here, as it does not affect the Court's ultimate conclusion that confusion was not likely.

The Court also notes Haas' failure to produce a consumer survey. While surveys are not required, when a plaintiff has no other evidence of actual confusion, its "failure to proffer survey evidence . . . suggests that the public is not likely to be confused." *Braun Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, 828 (Fed. Cir. 1992). Particularly considering that Haas' theory of consumer confusion calls for several logical steps and inferences—e.g., taking its two separate registered marks (MOSSY OAK and BREAK-UP), combining them into one term, shortening that combined term into the acronym MOBU—a survey would have been the most direct and persuasive way to show that consumers would make these same logical connections, particularly absent other proof of actual confusion. In short, the seventh digit strongly favors Dryshod.

*    *    *

The Court has not addressed the remaining digits because, in its view, these three decide the issue. Haas has not convinced the Court by a preponderance of the evidence that Dryshod's use of MOBU created a likelihood of confusion with Haas' marks. Together with the Court's conclusion above that Haas has not proven trademark ownership of MOBU, this resolves all of Haas' infringement claims.

### C. Denial of Dryshod's application to register MOBU

Haas asks the Court for an order directing the PTO to refuse Dryshod's pending application to register MOBU for "[f]ootwear; [w]aterproof footwear." U.S. Ser. No. 87/778,784. This request rests on the same allegations of trademark ownership and likelihood of confusion discussed above. Thus, for the same reasons, the Court finds against Haas on this claim.

**D.    Declaratory judgment of non-infringement**

Dryshod's two remaining counterclaims seek a declaratory judgment of copyright non-infringement and trademark non-infringement. These declaratory claims correspond to Haas' allegations of infringement. For the reasons discussed above, the Court finds for Dryshod on these declaratory claims.

**E.    Remaining disputes**

At trial, the parties disputed certain other legal or factual issues subsumed within the claims analyzed above. To the extent the Court has not explicitly addressed those disputes, they are moot in light of the Court's findings and conclusions.