IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| HAAS OUTDOORS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| DRYSHOD INTERNATIONAL, LLC and | § | 1:18-CV-978-RP |
| JAMES K. DONOHUE, | § | |
| | § | |
| Defendants. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The parties tried this case to the bench on October 25–27, 2021. The Court announced during trial that it would dismiss Plaintiff Haas Outdoors, Inc.'s ("Haas") claim for copyright infringement. at the close of Haas' case, the Court granted Defendants' Dryshod International, LLC and James K. Donohue's ("Donohue") (together, "Dryshod") motion for judgment on the copyright infringement claim under Federal Rule of Civil Procedure 52(c). (3 Tr. 96:5–9).

The following trademark claims remain for decision: (1) Haas' claim for federal trademark infringement under the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a); (2) Haas' claim for common law trademark infringement; (3) Haas' claim for denial of Dryshod's pending federal application to register the trademark MOBU, 15 U.S.C. §§ 1052(d) and 1119; and (4) Dryshod's claim for declaratory judgment of trademark non-infringement. (Dkts. 123, 126; *see also* Dkt. 173 (prior order dismissing Haas' federal and state trademark dilution claims)).

Each of the remaining trademark claims rests on the same basic question: did Dryshod's former use of the word MOBU, as part of a product style name on certain camouflage boot models, create a likelihood of consumer confusion with any trademark legally owned by Haas? Having

1

considered the record and the arguments of the parties, the Court finds Dryshod is entitled to judgment on the trademark claims.

## I. FINDINGS OF FACT

### A. The Parties' Businesses

Plaintiff Haas designs camouflage patterns for use on apparel and other consumer products. (1 Tr. 39:8–11, 41:11–15, 158:23–159:8.3).[1] Typically, Haas itself does not manufacture or sell products. (*Id.* at 40:25–41:10; 3 Tr. 145:14–16). Rather, it licenses other companies to make and sell products bearing Haas' camouflage patterns. (1 Tr. 41:11–42:21; *see also* 3 Tr. 144:24–25 (Haas' founder and chairman: "Largely, Haas Outdoors is involved, you know, managing intellectual property.")).

Haas' licensees sell a wide array of products, including footwear in some cases. (*See* 2 Tr. 250:5–11). The licensees sell products through various trade channels, including large and small retailers, independent dealers, and e-commerce. (1 Tr. at 43:21–45:4). They advertise through print ads, radio, television, trade shows, and the internet (including social media). (*Id.* at 46:8–47:14). Considering both Haas' own advertising and its licensees' advertising, Haas generates around three and a half billion advertising "impressions" annually. (*Id.* at 48:1–4).

Dryshod is owned and operated by husband and wife James and Maureen "Mimi" Donohue ("the Donohues"). (1 Tr. 219:19–21; 2 Tr. 229:8–13). Its business is premium waterproof rubber work boots, which it designs and manufactures under the brand name DRYSHOD. (2 Tr. 95:3–8, 98:18–99:4, 124:14–16). Some of Dryshod's boot models have a camouflage pattern, while others do not. (*Id.* at 98:21–99:4). The Dryshod camouflage boots relevant to Haas' trademark claims—which have not been manufactured since approximately June 2018, see infra pp.18–19—comprised only a small segment of Dryshod's product line. (*See* 2 Tr. 98:23–99:4; 3 Tr. 162:20–163:8).

---

[1] Trial transcript citations: "[Volume] Tr. [Page #]:[Line #]." Trial exhibit citations: "P-[Exhibit #]" for Plaintiff's; "D-[Exhibit #]" for Defendant's.

**B. Haas' Alleged Trademarks**

Haas' trademark claims involve four alleged marks. For reasons that will become clear, the

Court discusses the first mark separately from the other three.

<u>1. Haas' Alleged Mark MOBU</u>

The first alleged mark, MOBU, is not used by Haas or its licensees as a trademark in

commerce. (*See* 1 Tr. 112:4–6 (testimony of Haas' president: "Q. You can't point me to any licensed

product that has the trademark MOBU on it, can you? A. No, sir, I cannot."); 3 Tr. 25:3–5

(testimony of Haas' licensing manager: "Q. Have you ever seen a product from a Haas licensee with

MOBU on it?" A. No, sir.")). Haas does not advertise under the trademark MOBU, either. 1 Tr.

60:4–5.

At trial, Haas' president testified that the company makes a regular practice of "registering

both our trademarks and our copyrights." (*Id.* at 49:12–14). In that vein, Haas has filed at least 175

trademark applications over the years. (*Id.* at 108:12–17, 109:19–21). Despite this, it has never

applied to register MOBU. (*Id.* at 109:22–24; *see also, e.g.*, P-96, P-97, P-98, P-99, P-101 (examples of

Haas' registrations for various marks, none covering MOBU)).

In addition, Haas has issued "thousands" of trademark licenses over the years. (1 Tr. 110:24–

111:3). Haas' license agreements generally contain a Schedule A listing the specific trademarks and

copyrights being licensed. (*Id.* at 111:4–111:21; 3 Tr. 22:2–10). Haas has never listed MOBU as one

of the trademarks being licensed. (3 Tr. 22:11–14, 23:21–24:14). Haas' president acknowledged that

he could not identify "any legal document of any kind" from before this dispute in which Haas had

ever claimed to own MOBU as a trademark. (1 Tr. 110:20–23).

Haas advances two theories for why this Court should nonetheless allow it to claim

trademark ownership of MOBU. First, Haas points to evidence that some of its licensees have

occasionally used MOBU in the stock-keeping unit (SKU) number or color code for their products.

(1 Tr. 60:11–61:3, 198:23–199:4; see also, e.g., P-213, P- 220, P-443, P-457 (examples)). But Haas'

president admitted that those uses are merely "as a descriptor," not trademark uses. (1 Tr. 112:13–

25). He also acknowledged that use of MOBU by licensees is not something Haas controls or

requires, and the company provides no guidelines for how its licensees use MOBU as a descriptor.

(*Id.* at 113:2–25, 147:8–18; see also 3 Tr. 25:10–15 (similar testimony from Haas' licensing

manager)).

Second, Haas claims that the public widely uses MOBU to refer to Haas. Its evidence on this

point includes a handful of third-party internet screenshots and customer emails containing the

word MOBU (primarily from 2008 or earlier), seemingly as a reference to a licensed product's SKU

number or color code. (*E.g.*, P- 359; P-1971). Haas asserts that it can treat this public use as

establishing private trademark ownership for the company, under a rarely applied trademark

doctrine called the "public use doctrine." The Court addresses the legal merits of this contention

below in its conclusions of law.

<u>2. Haas' Alleged Marks MOSSY OAK, BREAK-UP and MOSSY OAK BREAK-UP</u>

Haas also alleges rights in three other marks: MOSSY OAK, BREAK-UP, and MOSSY

OAK BREAK-UP. (1 Tr. 9:13–16, 10:24–11:6). MOSSY OAK is the primary brand name under

which Haas publicly operates. (*Id.* at 65:4–13). BREAK-UP is a name Haas uses in several variations

to identify certain of its camouflage patterns. (*Id.* at 65:14–66:1).

Haas owns federal registrations for MOSSY OAK and BREAK-UP as separate marks. (P-

96, P-98, P-99). None of those registrations cover footwear or boots. See id. Haas owns no federal

registration for the combined term MOSSY OAK BREAK-UP. (1 Tr. 57:8–10).

Because it owns no registration, Haas claims "common law" rights in the combined term

MOSSY OAK BREAK-UP, arising from the company's use of that combined mark in commerce.

(1 Tr. 9:13–16; *see also*, *e.g.*, P-147, P-150 (Haas advertisements showing MOSSY OAK BREAK-UP

as part of a composite logo mark featuring a tree design)). Haas' licensing manager testified that MOSSY OAK and BREAK-UP are "separate trademarks" and that it "wouldn't make sense" to abbreviate them together as MOBU. (3 Tr. 32:5–7).

### C. Dryshod's Two Tracks of Product Development

The Donohues founded the Dryshod business in 2017. They did so at the urging of two independent distributors with whom they had worked at another rubber boot company the Donohues founded and sold fifteen years earlier, the Muck Boot Company. (*See* 1 Tr. 229:19–231:18; 2 Tr. 92:4–100:5, 242:17–243:24, 3 Tr. 100:2–106:2; P-11).

The product plan for Dryshod's introductory products in 2017 included boot models for the hunting category, some of which would have camouflage patterns. (*See* P-11; 2 Tr. 98:18–99:4). The plan also included boot models for non-hunting categories. *See id.* In the Dryshod business arrangement, Donohue handles design and manufacturing of the boots, while the independent distributors handle all importing, sales, marketing, and distribution. (*See* P-11; 2 Tr. 99:5–101:22; 3 Tr. 106:10–107:19).

By May 2017, Donohue was working on two parallel tracks for developing Dryshod's introductory products. (2 Tr. 23:10–13, 27:24–28:6, 148:7–19, 163:17–21; see also 2 Tr. 163:22–166:18 (additional background about Dryshod's product-development process)). On the first development track, Donohue was exploring whether he could obtain a license to use patterns from an established camouflage brand. (2 Tr. 23:11–12, 27:24–28:6). This track began in earnest on April 17, 2017, when Donohue submitted a licensing application to Haas. (P-13; *see* 1 Tr. 242:23–25; 2 Tr. 148:20–149:12). After a brief initial email exchange between Donohue and a Haas licensing representative, Haas went silent on Donohue's application for two-and-a-half months. (1 Tr. 141:22–142:5; 2 Tr. 41:4–17).

Though Donohue did not know it at the time, Haas' silence was apparently the result of internal concern about whether licensing Donohue might create business tension with Honeywell, a major Haas licensee who at the time owned the Donohues' former company, Muck Boot. (*See* D-203; D-214; *see also* 1 Tr. 153:1–19, 2 Tr. 93:21–25). Emails within Haas show that the licensing representative raised this concern with one of her colleagues shortly after receiving Donohue's application. (D-203; D-214). The licensing representative sought her colleague's input, but by late June, the colleague still had not responded. (*See* D-203). During this two-and-a-half month delay, the licensing representative did not follow up with Donohue. (*See* 1 Tr. 154:13–17; 2 Tr. 41:4–17). Haas' president acknowledged that the delay was "a bit longer than necessary." (1 Tr. 143:3–20).

Around a month later in May 2017, with the licensing discussions in limbo, Donohue initiated a second development track for Dryshod's introductory camouflage boot models. (3 Tr. 157:3–8). On this track, Donohue worked to create an original camouflage pattern for Dryshod's use, known as the "do-it-yourself" or "DIY" pattern. (2 Tr. 17:17–22, 27:24–28:6, 163:17–21).[2]

These two product development tracks continued in parallel throughout May, June, and early July 2017. (*See* 2 Tr. 148:20–149:24). As Donohue worked to develop the DIY pattern on the second track, he also continued to explore various licensing possibilities on the first track. He submitted a licensing application to True Timber— one of Haas' competitors—on June 9, 2017. (D-29; 2 Tr. 146:19–147:9). He and the distributors also discussed seeking a license from Realtree, another major camouflage brand, but ultimately did not pursue that option. (2 Tr. 146:8–13).

In late June 2017, having received no further communication from Haas on his first licensing application, Donohue submitted a second application. (P-45; *see* 1 Tr. 154:13–17 ("Q. . . . [Y]our company did not get back to Mr. Donahue [sic] on his licensing application at all until he sent a second application; isn't that right? A. That's right.")). The parties reconnected at that time, and

---

[2] The details of the DIY pattern's creation came into evidence during trial. The Court does not recount those facts here because they speak primarily to the already- resolved copyright infringement claim.

shortly after, Haas granted Dryshod permission to create developmental "look-see" boot prototypes with unused Haas fabric in China. (D-27; *see also* 2 Tr. 129:11–132:7).[3]

Three days later, on July 6, 2017, Haas for the first time sent a proposed formal license agreement to Donohue. (D-19; 2 Tr. 160:20–161:8). Haas' email transmitting the license agreement referred to it as an "execution copy" and instructed Donohue to "[p]lease sign" it. (D-19 at 1; 2 Tr. 161:12–23). The parties had not negotiated any of the agreement's language, and Haas had not sent Donohue any earlier draft to review. (2 Tr. 161:18–162:6). Donohue interpreted this as an indication that the proposed agreement was "all or none." (*Id.* at 162:7–11). Notably, the proposed agreement followed Haas' standard practice of including a Schedule A listing the specific Haas trademarks being offered for license. The list did not include MOBU. (*See* D-19 at Sch. A).

### D. Dryshod and the Distributors' Decision Not to License

While Dryshod and the distributors recognized the benefits of licensing from an established camouflage brand, they also shared several concerns about operating under a license. For example, Haas wanted Dryshod (not the distributors) to sign as the licensee. (D.34 at 2). Yet Haas' proposed license agreement contained accounting obligations that would have required the distributors' books, to which Dryshod had no access. (*See* 2 Tr. 151:3–14, 159:20–160:11). As another example, Dryshod and the distributors worried that operating under a license would make it competitively unwise, logistically difficult, and significantly more expensive for the factory to apply the Dryshod boots' special waterproofing compound, HYDROKOTE. (2 Tr. 152:14– 153:17; P-31 at 2; P-2022 at 2).

---

[3] Some of Haas' trial evidence concerned developmental "look-see" samples created by Dryshod or its vendors in China at various times in 2017. (*See, e.g.*, P-17, P-18, P-24, P-34 at 1, P-37 at 1; P-40 at 2; P-46). The Court heard uncontroverted testimony that development of look-see samples is standard practice in the footwear industry, (2 Tr. 125:6–16, 132:22–133:11); that Dryshod used these development samples only for internal "placeholder" purposes, (2 Tr. 48:18–20); and that Dryshod did not distribute, advertise, offer, sell, or publicly show these developmental samples, *see id.* at (2 Tr. 48:18–20, 60:4–11, 125:19–20, 134:16–135:21, 221:1–4). Because the Court is applying trademark law, its analysis focuses on the Dryshod boots actually offered and sold to the public, not the developmental samples. *See RJ Machine Co. v. Canada Pipeline Accessories Co.*, 116 F. Supp. 3d 795, 817 n.13 (W.D. Tex. 2015) (noting that "[t]rademark law concerns the use of marks in commerce," not "internal research project[s] that never enter[] the flow of commerce").

Donohue raised some of these concerns with Haas later in 2017, (e.g., 2 Tr. 153:20–160:16; D-30; D-52; D-65 at 1; P-31 at 2; P-49), but Haas offered no ideas or solutions, (2 Tr. 162:12–24).

Ultimately, Dryshod and the distributors concluded that their concerns about licensing outweighed the benefits, at least for the introductory boot models being developed in 2017. (*See* 2 Tr. 150:22–151:2). At a July 10, 2017 meeting in Austin, the distributors greenlit Donohue to proceed on the second development track—using the original DIY pattern—for the introductory models. (*Id.* at 149:13–24).

Later in the year, Haas followed up to ask whether Dryshod was still interested in taking a license. (D-30 at 2). Donohue responded that Dryshod had decided to "pass on adopting Mossy Oak (or any other licensed camo brand) for the initial DRYSHOD product line," reiterating many of the same concerns outlined above. (*Id.* at 1).

Though Dryshod and the distributors chose to move forward with the DIY pattern for the introductory models, they did not rule out licensing for future models. (*See* 2 Tr. 148:7–19, 163:3–8; *see also id.* at 36:15–18 ("We fully intended to do business with Mossy Oak, even after we did our own [camo pattern], Mossy Oak would still be in consideration as a licensed camo.")). For more recent products developed since 2017, the Dryshod distributors have in fact taken licenses from other camouflage brands. (*Id.* at 36:19–20, 163:9–12). Donohue testified that, had Haas not filed this lawsuit, he believes Dryshod's distributors would have eventually licensed from Haas, too. (*Id.* at 163:13–16 ("We probably would be a [Haas] licensee.")).

### E. Donohue's Conception of the MOBU Name

Early in development, Donohue conceived the term MOBU for use as part of a product style name on some of Dryshod's introductory boot models. (1 Tr. 238:7– 240:25; 2 Tr. 102:10–22; *see* P-10 (Donohue's March 2017 notes showing MOBU MAX as a potential name)). Donohue's original name idea was MOBETA SHREDDA, a reference to one of his two distributors, Jerome

Srednicki (SHRED-neck-ee). (2 Tr. 102:23–104:5; 3 Tr. 110:11–111:6; *see also* P-33 at 2 (June 2017 email noting that MOBETA remained a "backup name")). After further brainstorming, Donohue decided that MOBETA did not mesh with the customer demographics for hunting boots, leading him to change the name to MOBU. (2 Tr. 105:3–107:7). The MOBU name was thematically consistent with other names Donohue has brainstormed or used on boot models, including for example DUNGHO, TOODOO, MOSHU, and GOSHU. (*See id.* at 104:6–23; P-10).

When he first conceived of MOBU in March 2017, Donohue thought of it as "just a word," not necessarily an acronym or an abbreviation. (2 Tr. 107:20–23, 166:19–22). However, because Donohue conceived the name early in development, he considered it important that MOBU be ambiguous and flexible enough to work on multiple potential product-development tracks. (*See id.* at 166:23–167:13).

To that end, on the licensing track initiated in April 2017, Donohue felt that the MOBU name could potentially work as an acronym for "Mossy Oak Break-Up" under a Haas license. (2 Tr. 50:5–10, 77:24–78:2, 168:23–170:11). Donohue's emails from 2017 show that he regularly discussed the possibility of using the MOBU name in this way. (*E.g.*, P-33 at 2; P-42 at 2; P-2022 at 2). He testified similarly at trial:

> Q. My  question to you is, what did [MOBU] refer to before you were creating your own pattern?
>
> A. It was just MOBU.
>
> Q. It did not stand for –
>
> A. We had considered it [for a] Mossy Oak pattern, also. I had explained over and over, we had two tracks. We were contemplating a licensing track and a custom track or a unlicensed track. So you're going to find Mossy Oak popping up all over the place in my e-mails

because that was one of the tracks. I don't deny that Mossy Oak was part of the discussion all along.

(2 Tr. 23:6–16).

On the non-licensing track, Donohue brainstormed an idea in which MOBU could stand for "My Own Break Up." (2 Tr. 167:14–17, 175:8–20; 3 Tr. 111:22–112:1; *see also* P-31 at 2). A bit later in 2017, Donohue produced a potential hangtag for Dryshod's MOBU boots that said, "Rather than get caught up in today's camo wars, we decided to make our own. It's called MOBU-short for 'My Own Break-Up.'" (P-66 at 2; *see* 2 Tr. 74:11–81:8, 175:21–178:11; 3 Tr. 112:2–6, 136:19–137:11 (additional testimony regarding the hangtag)). After one of Dryshod's distributors raised concerns because BREAK-UP is a Haas trademark, (P-67), Dryshod scrapped the hangtag idea and had it removed at the factory. (3 Tr. 112:7–12; *see also* 2 Tr. 81:9–11, 82:25–83:21 ("[It] was removed for Break-Up, not MOBU.")). The Court heard no evidence that any Dryshod boots ever shipped with the hangtag or that consumers ever saw the hangtag. (*See* 2 Tr. 177:3–7, 177:18–20).

### F. Donohue's Intent

At trial, Haas sought to cast doubt on Dryshod's reasons for selecting the MOBU name, urging that he did so with intent to confuse consumers. Haas focused especially on an email Donohue sent to his vendors in China on June 15, 2017, in which he stated that "'MOBU was originally suppose[d] to refer to 'Mossy Oak Break- Up.'" (P-2022 at 2; *see* 2 Tr. 24:11–26:4; 3 Tr. 134:22–136:7).

Donohue denied that his use of "originally" in this email was referring to when he first conceived of the MOBU name in March 2017. (2 Tr. 25:13–21). Rather, he testified, "originally" was referring to the fact that he initiated licensing discussions with Haas before he started on the alternative track of developing the DIY pattern (April 2017 versus May 2017, respectively). (*See* 3 Tr. 155:10–14, 157:3–23). This testimony finds corroboration in the next two sentences of Donohue's

10

email: "But, applying the Hydrokote to Mossy Oak would be difficult So, we decided to look into to [sic] the DIY Camo with Honor." P-2022 at 2. Dryshod's distributor also corroborated this sequence of events, testifying that Dryshod originally wanted to use licensed camouflage and only later had the idea to develop its own original camouflage pattern. (3 Tr. 137:21–138:10).

More broadly, Donohue testified unequivocally that he did not intend to confuse consumers with the MOBU name. (2 Tr. 171:10–12; *see also* 3 Tr. 113:6–8, 113:24–114:4 (similar testimony from Dryshod's distributor)). Donohue testified that he "had never heard of anybody refer to Mossy Oak Break-Up as MOBU in the public" and had never seen Haas use MOBU as a trademark. (2 Tr. 84:19–25). One of Dryshod's distributors told Donohue—after this lawsuit was filed in 2018—that MOBU was a "relatively well-known abbreviation" of "Mossy Oak Break-Up." (P-88 at 1). However, that distributor testified to knowing of MOBU "[o]nly [as] as color designation," not as a Haas trademark. (3 Tr. 116:2–23, 134:7–14; *see also supra* p.4).

Haas also suggested at trial that the "My Own Break-Up" concept showed bad-faith intent by Donohue. (*See, e.g.*, 2 Tr. 82:19–83:6). Having heard all of the evidence, the Court disagrees. The evidence—including admissions from Haas itself— establishes that the term "break up" has a common, functional connotation in camouflage parlance. (*See* 1 Tr. 114:15–18). Specifically, camouflage works to "break up" the wearer's outline against his or her background. (1 Tr. 114:7–10 (admission on this point from Haas' president); 3 Tr. 149:9–151:2 (same admission from Haas' founder and chairman)). For this reason, Haas' president acknowledged that the company does not own the words "break up" when used in print. (1 Tr. 115:23–116:2). And for his part, Donohue testified that the slogan "My Own Break Up" on the defunct hangtag was intended as reference to this functional effect—i.e., it was Donohue's own ("My Own") version of camouflage intended to

achieve that functional effect for the wearer ("Break Up"). (*See* 2 Tr. 167:18–168:3, 168:18–22, 175:8–20).[4]

The Court finds Donohue's testimony credible on these various issues. The Court also notes that, in many cases, his testimony finds ample corroboration in contemporaneous documents or other witnesses' testimony. The Court discusses Donohue's intent further in its conclusions of law.

### G. Donohue's Clearance Searches and Applications to Register MOBU

Before finalizing the MOBU name for production boots, Donohue searched for conflicting trademarks. (2 Tr. 108:15–110:9, 111:7–10). Except for a toy company in Japan, he found no one else owning a trademark for MOBU. (*Id.* at 110:10–12, 111:4–6; D-9). Haas did not show up during his research, and he saw nothing to make him think Haas owned MOBU as a trademark. (2 Tr. 110:13–17; D-9).

Having found no conflicting marks, Donohue filed an application on October 21, 2017 to register MOBU with the U.S. Patent and Trademark Office (PTO). (P-64; 2 Tr. 112:1–5). His application suffered from a technical issue with the goods identification, which the PTO flagged. (*See* 2 Tr. 112:6–113:10, 114:19–115:5). The PTO's examining attorney suggested that Donohue re-file in the correct category for boots. (*Id.* at 114:25–115:2). Donohue heeded the advice and filed a new application for MOBU on January 31, 2018. (D-324; 2 Tr. 115:9–18). The second application identified the goods as follows: "[f]ootwear; [w]aterproof footwear." (D-324 at 1).

Donohue's second application was allowed by the PTO, which found no conflicting marks.[5] (D-326 ("The mark of the application identified appears to be entitled to registration"); 2 Tr.

---

[4] The Court's discussion of the term "break up" has no bearing on the validity of Haas' registered BREAK-UP trademark, which is not at issue. The meaning of "break up" is relevant because it speaks to Donohue's good-faith intent, which Haas put at issue during trial. (*See* 1 Tr. 114:22–115:21 (overruling a relevance objection from Haas about "break up"); *see also infra* pp. 29, 31–32).

[5] Before allowing an application to publish, the PTO searches for conflicting registrations or pending applications as part of its examination process. *See* 37 C.F.R. §§ 2.61, 2.80; Trademark Manual of Examining Procedure (TMEP) §§ 1207–08 (July 2021).

115:25–116:25). Haas opposed the application after the PTO allowed it. The Court addresses Haas'

opposition in Part B of its conclusions of law.

### H. Dryshod's Use of MOBU

Consistent with how Dryshod generally presents its boot models, MOBU appeared on the

boot and the packaging as part of the product's style name and product watermark, alongside the

primary brand name DRYSHOD. (*See* 3 Tr. 119:1–14). Dryshod's boots come in boxes that

prominently feature the primary brand name DRYSHOD and contain information about the boots'

technical features. (3 Tr. 118:3– 8, 118:15–119:3).

The images below show one of Dryshod's former MOBU boots and representative product

packaging for Dryshod's boots, respectively:





(P-114 (Dryshod MOBU SHREDDER boot; physical exhibit); D-198 & D-199 (Dryshod

representative boot packaging; physical exhibit)).

In contrast to Dryshod's MOBU boots, which are in the record, Haas offered no physical

product specimens showing its trademarks. Haas' founder and chairman testified that the company

does not manufacture boots, (3 Tr. 145:1–10), and to the extent its licensees make boots or

footwear, Haas offered no evidence showing any licensed boots or footwear bearing Haas'

trademarks on the product.

The Dryshod MOBU boots were distributed to a wide geographic area covering the entire

United States. (*See* 3 Tr. 106:19–107:3, 119:25–120:2). Dryshod stopped manufacturing and shipping

the MOBU boots by the middle of 2018, as discussed below. By the time of trial, Dryshod had

developed about 75 total boot models across all product lines. (3 Tr. 108:16–19). Only "seven or

eight" of those models ever bore the MOBU style name. (*Id.* at 108:20–109:5).

## I. Haas' Demand Letter and This Lawsuit

On January 10, 2018, Haas' outside counsel sent a demand letter to Dryshod. (D-18). The

letter claimed that Dryshod's use of MOBU on its boots infringed Haas' "MOSSY OAK BREAK-

UP® registered trademark." (*Id.* at 2). Haas admitted at trial that, despite this statement in the letter,

it owns no trademark registration for the combined term "MOSSY OAK BREAK-UP." (1 Tr. 57:8–

10). Haas' letter did not claim trademark ownership of the word MOBU itself, and it offered no evidence of Haas using MOBU as a trademark. (*See id.*).

The same day, Donohue responded to Haas' counsel with a detailed email. (D-24; *see also* 2 Tr. 202:5–24 (additional testimony about Donohue's reaction to the demand letter)). He denied Haas' allegations, including a specific denial that there would be any consumer confusion. D-24 at 1. Donohue also invited Haas to call him and provided his cell number. Id. at 2; see also 2 Tr. 205:9–10 ("I was trying to be friends. I thought we could work something out."). When Haas did not respond, Donohue reiterated that invitation in another email a few days later. D-23; see 2 Tr. 208:4–16 ("I explained that I had not heard back from anybody . . . and I gave my number again.").

Haas sent Dryshod no further communication after the initial demand letter. (2 Tr. 208:20–209:5). It filed suit twelve days later. (Dkt. 1, Haas Outdoors, Inc. v. Dryshod Int'l, LLC, No. 1:18-cv-00057-LY (W.D. Tex. filed Jan. 22, 2018)). Haas dismissed that action less than a month after filing it and re-filed suit in the Northern District of Mississippi. The Mississippi action was later transferred to this Court.

On February 27, 2018, before being served with this lawsuit, Dryshod sent another letter offering to remove MOBU from any camouflage boots. (D-201 at 5; *see also* Dkts. 8 & 9 (executed summonses showing service on March 5, 2018)). Haas did not respond to that offer. (2 Tr. 210:25–211:3). Haas' founder and chairman later testified that he did not know Donohue had offered to speak to Haas' attorneys or that he had offered to remove MOBU. (3 Tr. 148:2–7).

Despite receiving no response from Haas, Dryshod honored its offer and removed MOBU from the boots anyway. (2 Tr. 211:4–10; see also 3 Tr. 141:7–8 ("We took it off because we were trying to avoid any further confrontation.")). The factory then used up a limited inventory of fabric containing the MOBU product watermark, and the last boot bearing the MOBU watermark shipped

15

in June 2018. (2 Tr. 211:11– 212:3). Dryshod has not shipped any boots with MOBU since that time. (*Id.* at 211:25– 212:3; *accord* 3 Tr. 127:4–16).

At trial, one of Dryshod's distributors succinctly explained the decision to remove the MOBU name:

> Q. Once you became aware of the lawsuit, did CFD, Team-J and Dryshod make any
>
> changes?
>
> A. We took MOBU off of everything.
>
> Q. Why did you decide to remove MOBU?
>
> A. It wasn't worth the trouble.
>
> Q. Why didn't you believe it was worth the trouble?
>
> A. It wasn't an important part of our boot. It was just a name that we had used to describe it

(3 Tr. 126:13–20).

### J. Lack of Actual-Confusion Evidence

Haas produced no evidence of actual confusion. It also produced no consumer survey. Though Haas suggested during trial that a handful of exhibits showed confusion, (*see, e.g.*, 1 Tr. 89:18–22; 2 Tr. 260:23–261:2), the Court finds Haas' position about those exhibits to be speculative and lacking foundation, and that the exhibits fail to show any trademark-relevant confusion. The Court discusses this issue further in its conclusions of law.

Finally, both Dryshod's and Haas' witnesses testified consistently that they knew of no confusion arising from Dryshod's use of the MOBU name. (*E.g.*, 1 Tr. 141:15–21; 2 Tr. 200:4–7, 200:19–24; 3 Tr. 21:21–22:1, 142:7–11). Dryshod's distributor testified that Dryshod's boots have been "very" successful and that sales have "continued to go up" since removal of the MOBU name in mid-2018. (3 Tr. 127:24–128:18, 129:16–21).

16

## II. CONCLUSIONS OF LAW

The Court concludes that Haas has not met its burden to prove trademark infringement by a preponderance of the evidence. This conclusion resolves each of the remaining trademark claims.

### A. Trademark Infringement Claims

To show trademark infringement, a plaintiff must prove: (1) ownership of a legally protectable mark, and (2) a likelihood of consumer confusion between the parties' marks. *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 235–36 (5th Cir. 2010) (citations omitted).[6] Haas has not met its burden to prove these two elements. The evidence fails to prove the first element as to the alleged mark MOBU, and it fails to prove the second element as to the alleged marks MOSSY OAK, BREAK-UP, and MOSSY OAK BREAK-UP.

### 1. Infringement of Hass' Alleged Mark MOBU

The Court begins with Haas' claim that it owns, and that Dryshod thus infringed, the alleged trademark MOBU. Haas owns no federal registration for MOBU, so it must establish ownership of MOBU as an unregistered trademark (sometimes called a "common law" trademark). *See Matal v. Tam*, 137 S. Ct. 1744, 1752–53 (2017).

"Ownership of a mark requires a combination of both appropriation and use in trade." *Blue Bell, Inc. v. Farah Mfg. Co.*, 508 F.2d 1260, 1264–65 (5th Cir. 1975) (citing *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90 (1918)). "[N]either conception of the mark nor advertising alone establishes trademark rights at common law." *Blue Bell*, 508 F.2d at 1265 (citations omitted). Rather, trademark ownership accrues only "when goods bearing the mark are placed on the market." *Id.*; *accord, e.g.*, *Union Nat'l Bank of Tex., Laredo v. Union Nat'l Bank of Tex., Austin*, 909 F.2d 839, 842–43 (5th Cir. 1990); *see also* 15 U.S.C. § 1127 (definitions of trademark and use in commerce).

---

[6] The elements of trademark infringement are the same under the Lanham Act and common law. *Choice Hotels Int'l, Inc. v. Patel*, 940 F. Supp. 2d 532, 538–39 (S.D. Tex. 2013). Also, the Lanham Act infringement elements are the same whether the claim arises under 15 U.S.C. § 1114(1) or § 1125(a). *Id.* Section 1114(1) requires a registered mark, while § 1125(a) covers infringement of unregistered marks.

The Court heard no evidence that Haas or its licensees use MOBU as a trademark in commerce. Haas admitted that it could not point to any legal document from before this dispute in which the company ever claimed to own MOBU as a trademark. Haas also acknowledged that it has never applied to register MOBU— despite considering it important to protect the company's IP and despite filing at least 175 applications for various trademarks over the years.

Normally, these facts would end the ownership inquiry. However, Haas offers two theories for why the Court should nonetheless conclude that the company owns MOBU as a trademark.

For its first theory, Haas points to the evidence of some licensees using MOBU in their products' SKUs or color codes. Haas posits that it can "claim" this use by licensees, citing the principle that a licensee's use inures to the benefit of the licensor. *See generally Turner v. HMH Publ'g Co.*, 380 F.2d 224, 227 (5th Cir. 1967).

The Court finds this theory problematic for a few reasons. To start, the principle that a licensee's use inures to the licensor's benefit presumes that the mark at issue is licensed. Haas introduced no evidence that any of its license agreements— of which Haas has issued thousands— cover MOBU as one of the licensed marks. The absence of any agreement covering MOBU as a licensed trademark is particularly significant because Haas' license agreements contain schedules listing each individual copyright and trademark being licensed. The Court finds it unusual that a company whose business model revolves around licensing intellectual property claims to own a piece of intellectual property it has never once licensed in thousands of opportunities.

In addition, Haas admitted that its licensees use MOBU only "as a descriptor"—i.e., as part of the SKU or color code—not as a trademark. Haas could not identify any licensed product bearing MOBU as a trademark. The licensees using MOBU in their SKU and color codes apparently do so on their own initiative, as Haas neither requires nor encourages this use. And perhaps more critically, Haas admitted that it does not control how its licensees use MOBU. *See Kentucky Fried Chicken Corp.*

18

*v. Diversified Pkg. Corp.*, 549 F.2d 368, 387 (5th Cir. 1977) (explaining that licensing a trademark requires the licensor to exercise quality control because, without it, "the trademark will cease to have utility as an informational device").

Haas has provided no authority for the proposition that the seemingly indiscriminate, uncontrolled, and potentially inconsistent display of a SKU, color code, or similar descriptor by certain licensees—of an alleged mark not covered by any of their license agreements, no less—could "count" as use in commerce of that unlicensed mark by the putative licensor. The Court declines to chart new ground by adopting this apparently novel proposition.

Haas' second theory for claiming legal ownership of MOBU rests on a rarely applied trademark law doctrine, sometimes called the "public use" doctrine. *See George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 403–04 (4th Cir. 2009) (discussing the doctrine but declining to apply it). As construed by Haas, this doctrine stands for the proposition that a plaintiff may claim rights in any mark the public widely uses to reference the plaintiff, even if the plaintiff does not itself use that mark in commerce. (*See, e.g.*, Dkt. 179, at 18–20).

It does not appear that the Fifth Circuit has ever adopted the rule that public use alone can confer trademark rights on a private owner. The closest Fifth Circuit precedent appears to be *Volkswagenwerk Aktiengesellschaft v. Rickard*, 492 F.2d 474 (5th Cir. 1974), but in that case (and unlike here), the plaintiff itself had used the mark "in its own advertising for many years." *Id.* at 478. Other courts have noted that the public-use doctrine is "extremely limited in scope," *George & Co.*, 575 F.3d at 403, and that it is "doubtful . . . whether a manufacturer can claim protection for an abbreviation of a trademark that it has never formally used," *Cont. Corrugated Container Corp. v. Cont. Grp.*, 462 F. Supp. 200, 204 (S.D.N.Y. 1978).

To the extent courts outside the Fifth Circuit have rarely allowed public use to confer private trademark rights, this seems to have happened only when the plaintiff proved that the alleged mark

was an extremely famous nickname with widespread and mainstream consumer recognition. *See*
*Johnny Blastoff, Inc. v. L.A. Rams Football Co.*, 188 F.3d 427, 434–35 (7th Cir. 1999) (allowing the Los
Angeles Rams football team to claim ownership of ST. LOUIS RAMS); *Coca-Cola Co. v. L.A Brewing*
*Co.*, 44 U.S.P.Q. 190, 192–93 (S.D. Cal. 1939) (allowing the Coca-Cola Company to claim ownership
of COKE); *New York Yankees P'ship v. Evil Enters., Inc.*, No. 91192764, 2013 WL 1305332, at *4–6
(T.T.A.B. Feb. 8, 2013) (allowing the New York Yankees baseball team to claim ownership of EVIL
EMPIRE).

The Court sees little comparison between these precedents and Haas' claim to own MOBU.
The sporadic public use of MOBU in the record does not rise to nearly the same level. The Court is
mindful of the foundational principle that trademark rights in the U.S. can arise only from trademark
use in commerce. With no binding authority creating an exception for so-called "public use," the
Court declines on these facts to depart from that principle.[7]

In sum, Haas has failed to prove by a preponderance of the evidence that it legally owns the
trademark MOBU. Its infringement claim based on that alleged mark thus fails on the first element.
*See Amazing Spaces*, 608 F.3d at 235–36.

### 2. Infringement of Haas' Alleged Marks MOSSY OAK, BREAK-UP, and MOSSY OAK BREAK-UP

The Court turns now to Haas' claim that Dryshod's use of MOBU infringed the marks
MOSSY OAK, BREAK-UP, and MOSSY OAK BREAK-UP. It is undisputed that Haas owns
incontestable federal registrations for the first two marks separately. The evidence also shows that
Haas has sometimes used in advertising the combined mark MOSSY OAK BREAK-UP—primarily

---

[7] The Court has no occasion to address whether, if used in commerce by Haas in the future, MOBU would
be legally protectable (i.e., whether it would be a distinctive mark). The parties argued about the mark's
distinctiveness at summary judgment, (*see* Dkt. 227 at 16–19), but did not re-urge those points at trial. The
Court notes that, even for inherently distinctive marks, trademark ownership requires appropriation and use
in commerce. See 2 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 16:4 (5th ed. 2019)
(citing *Theodore Rectanus*, 248 U.S. at 100).

as part of a composite logo mark including a tree design, (*e.g.*, P-147, P-150)—though Haas owns no registration for that combined mark. Because Haas' ownership of these three marks (two registered, one common law) is not under serious dispute, the Court focuses its analysis on the second element of trademark infringement: the likelihood of consumer confusion.

Proving a likelihood of confusion requires proving that confusion was probable, not merely possible. *Bd. of Supervisors for La. State Univ. v. Smack Apparel*, 550 F.3d 465, 478 (5th Cir. 2008) (citing *Westchester Media PRL USA Holdings, Inc.*, 214 F.3d 658, 663–64 (5th Cir. 2000)). The Fifth Circuit uses a multifactor test to judge the likelihood of confusion. The eight factors, known as the "digits of confusion," are: (1) the type of mark allegedly infringed; (2) the similarity of the parties' marks; (3) the similarity of the parties' products or services; (4) the identity of the retail outlets and purchasers; (5) the identity of the advertising media used; (6) the defendant's intent; (7) any evidence of actual confusion; and (8) the degree of care exercised by potential purchasers. *Springboards to Educ., Inc. v. Hou. Indep. Sch. Dist.*, 912 F.3d 805, 812 (5th Cir. 2019) (citing *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 451 (5th Cir. 2017)).

These nonexhaustive digits are flexible and "'do not apply mechanically to every case.'" *Id.* (quoting *Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 485 (5th Cir. 2004)). The Court has discretion to weigh the digits "differently from case to case, depending on the particular facts and circumstances." *Future Proof Brands, LLC v. Molson Coors. Bev. Co.*, 982 F.3d 280, 289 (5th Cir. 2020) (citing *Streamline*, 851 F.3d at 453). Nonetheless, two digits possess "particular prominence": the defendant's intent (digit six), and evidence of actual confusion (digit seven). *Id.* Regardless of which digits carry the day, the plaintiff always bears the burden to prove the likelihood of confusion. *See Viacom Int'l v. IJR Capital Inv., LLC*, 891 F.3d 178, 191–92 (5th Cir. 2018). The Court addresses the digits in turn.

21

i. Type of Mark (Digit One)

The first confusion digit refers to the strength of the plaintiff's mark. *Future Proof*, 982 F.3d at 289. Strong marks receive more protection. *Id.* Evaluating a mark's strength involves two considerations: (1) where the mark falls on a spectrum of categories, and (2) the mark's standing in the marketplace. *Id.* at 290 (citing *Am. Rice, Inc. v. Prods. Rice Mill, Inc.*, 518 F.3d 321, 330 (5th Cir. 2008)). The spectrum of categories, from weakest marks to strongest marks, goes: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful. *Id.* (citing *Streamline*, 851 F.3d at 451).

On the first component, Haas proved that it owns incontestable registrations from MOSSY OAK and BREAK UP as separate marks, entitling those two marks to a conclusive presumption of validity. *See* 15 U.S.C. §§ 1065, 1115(b). However, the Fifth Circuit has emphasized that a mark's validity is a different question than its strength. *Future Proof*, 982 F.3d at 290–91. This Court has previously concluded that the BREAK-UP mark is not generic. (Dkt. 227, at 34–36). It likewise concludes that MOSSY OAK and MOSSY OAK BREAK-UP are not generic. Beyond that, however, Haas offered little evidence allowing the Court to accurately place its three marks on the trademark spectrum between descriptive and fanciful.

On the second component, Haas offered some evidence tending to show its marks' standing in the marketplace. Specifically, Haas has been in business for several decades and has a significant number of licensees across several product categories. Haas also introduced examples of a few of its advertisements showing the marks, and Haas receives billions of advertising impressions each year. *See T-Mobile US, Inc. v. AIO Wireless LLC*, 991 F. Supp. 2d 888, 914 (S.D. Tex. 2014) (citation omitted) (noting "extensive advertising, length of time in business, public recognition, and uniqueness" as relevant factors in the strength analysis).

Still, Haas offered no evidence showing its sales figures or advertising expenditures, nor any evidence putting its business success into marketplace context. *See* 2 McCarthy, *supra*, § 11:81 ("[T]he

trademark owner should put its sales and advertising figures in perspective by comparing them to the sales and advertising figures for similar products to show that this mark is relatively strong in its category."). Haas also failed to demonstrate whether its advertising impressions actually expose consumers to any of the three relevant marks asserted against Dryshod. This sort of evidence would have helped the Court evaluate the standing of Haas' marks in the marketplace.

In all, the record suggests that MOSSY OAK, BREAK-UP, and MOSSY OAK BREAK-UP may be somewhat strong marks. But the record is insufficient to conclude that the marks are strong enough to tilt the first confusion digit heavily in Haas' favor.

ii. Similarity of Marks (Digit Two)

Assessing the similarity of marks "'requires consideration of the marks' appearance, sound, and meaning.'" *Viacom*, 891 F.3d at 193 (quoting *Streamline*, 851 F.3d at 454). Haas' three marks—MOSSY OAK, BREAK-UP, and MOSSY OAK BREAK-UP—each differ significantly in appearance and sound from Dryshod's mark MOBU. This visual and phonetic dissimilarity tends to suggest that consumers would not have been confused.

The question of similarity in meaning is more nuanced, but still favors Dryshod. Haas asserts that MOBU is a well-known acronym standing for "Mossy Oak Break-Up." The Court heard some evidence supporting this contention, at least in the context of MOBU being used as a descriptive SKU or color code by some of Haas' licensees. In a similar vein, Donohue acknowledged that the parties could have potentially marketed MOBU as standing for "Mossy Oak Break-Up" in the event Dryshod had obtained a Haas license.

At the same time, however, it is clear that MOBU is an ambiguous word subject to more than one possible meaning. Indeed, this was a major part of its appeal for Dryshod as a product style name in the first place. That Dryshod at one point planned to market MOBU as meaning "My Own

Break Up"—as a reference to the concededly functional "break up" effect of camouflage—illustrates the point.

Beyond that, the Court notes a more basic failing in Haas' evidence on the second confusion digit. Trademark law requires comparison of the parties' marks in their actual marketplace context as consumers would have perceived them—e.g., on actual products, packaging, and marketing. *See Future Proof*, 982 F.3d at 295 (emphasizing that the second digit compares the marks "in the context that a customer perceives them in the marketplace, which can include labels, packages, or advertising material directed to the goods" (quotation omitted; cleaned up)); *Scott Fetzer*, 381 F.3d at 486 ("[T]he particular context in which the [defendant's] mark appears must receive special emphasis."). Haas failed to introduce the necessary evidence for the Court to make this contextual marketplace comparison.

The record contains Dryshod's boots bearing the MOBU mark and representative packaging for Dryshod's boots. But the record contains no physical products bearing Haas' trademarks for comparison. Also, the Court received no other evidence showing Haas-licensed footwear bearing the MOSSY OAK BREAK-UP trademark, to which Haas wants Dryshod's MOBU mark compared, on the product. Likewise, the Court received minimal evidence of packaging, marketing materials, or other collateral showing Haas or Haas-licensed products bearing MOSSY OAK BREAK-UP as a trademark on the product.

The Court emphasizes that the relevant question is whether MOBU, as it appeared on Dryshod's boots in their real-world marketplace context, would create a similar impression among consumers as Haas' trademarks, as they appeared in their real-world marketplace context. *See Future Proof*, 982 F.3d at 295; *Scott Fetzer*, 381 F.3d at 485–86; *see also* 4 McCarthy, *supra*, § 23:58 ("To arrive at a realistic evaluation of the likelihood of buyer confusion, the court must attempt to recreate the

conditions under which prospective purchasers make their choices."). Haas simply did not provide evidence allowing the Court to draw any firm conclusions on that issue.

### iii. Similarity of Products (Digit Three)

Dryshod used the MOBU mark on premium rubber work boots, and Haas introduced evidence that some of its licensees sell footwear. The facts establish, at least to some degree, that the parties deal in somewhat related products.

That said, Haas' evidence on this digit suffers from the same basic problem as its evidence on the second digit. Haas failed to produce any examples of actual footwear its licensees sell bearing the relevant marks MOSSY OAK, BREAK-UP, or MOSSY OAK BREAK-UP on the product. *See Future Proof*, 982 F.3d at 295; *Scott Fetzer*, 381 F.3d at 485–86. Without this evidence, the Court cannot fully evaluate the similarity of the parties' products and how that similarity (or lack thereof) may impact the likelihood of confusion.

### iv. Similarity of Retail Outlets, Purchasers, and Advertising (Digits Four and Five)

The Court heard evidence tending to show that there is at least some overlap in the parties' retail outlets, purchasers, and advertising media. However, given the dissimilarity of the marks (discussed above) and the lack of evidence of actual confusion (discussed below), the Court does not find that digits four and five materially affect the analysis. Se *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 172–73 (5th Cir. 1986) (holding that the plaintiff's showing of overlap on these two digits was insufficient to even raise of question of fact because of its "poor showing on [other] factors," including dissimilarity of the marks and lack of actual confusion).

### v. The Defendant's Intent (Digit Six)

On the sixth confusion digit, the Court asks whether the defendant "'intended to derive benefits from the reputation of the plaintiff.'" *Future Proof*, 982 F.3d at 296 (quoting *Streamline*, 851

F.3d at 455). Mere knowledge of the plaintiff's marks does not establish bad intent. *Id.* (citing *Streamline*, 851 F.3d at 456).

The Court heard no compelling evidence that Donohue selected the MOBU name with bad intent. To the contrary, the weight of the evidence suggests that Dryshod chose the MOBU name in good faith. For example, Donohue ran a trademark search and took steps to clear the name before putting it on Dryshod's boots; the PTO allowed his application to register MOBU, finding no conflicting marks; Haas never claimed to own MOBU as a trademark or asserted rights until this dispute; and Haas' proposed license agreement sent to Donohue in July 2017 did not list MOBU as a Haas trademark.

Donohue's emails during product development—and in particular, the June 15, 2017 email on which Haas focused at trial—likewise fail to show bad intent. The Court concludes that Donohue's emails are consistent with a good-faith product development process proceeding along two tracks: the first one in which Dryshod sought a license from Haas, and the second one in which Dryshod was developing its original DIY camo pattern. Though Donohue recognized that MOBU could potentially be interpreted as meaning "Mossy Oak Break Up," the evidence does not show that he selected the MOBU name with any intent to create that association or otherwise in bad faith.[8]

### vi. Actual-Confusion Evidence (Digit Seven)

On the seventh digit, the Court finds highly persuasive that Haas failed to produce any evidence of actual consumer confusion. The Court recognizes that actual confusion is not required to prove a likelihood of confusion. *Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44, 45–46 (5th Cir. 1975). Nonetheless, actual confusion is "the best evidence of likelihood of confusion." *Id.* at 46.

---

[8] The Fifth Circuit has noted "inconsistent" language in its precedent about whether the sixth digit can affirmatively weigh against a likelihood of confusion. *Future Proof*, 982 F.3d at 296. The Court does not opine on that issue here, as it does not affect the Court's ultimate conclusion that confusion was not likely.

In the factual context of this case, the Court finds the lack of actual confusion evidence compelling. Haas contends that the public widely understands MOBU to mean "Mossy Oak Break-Up," and that Dryshod selected the name intentionally to trade off Haas' reputation. If those two things were true, one would expect to see a significant amount of confusion arising from Dryshod's use of MOBU on camouflage boots, or at least some confusion. Instead, Haas showed none.

What's more, the record suggests that consumers had ample opportunity to express any confusion. *See Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1362 (11th Cir. 2019) (quoting *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208l 228 (2d Cir. 1999) ("'The . . . absence of actual confusion can be highly effective in showing a . . . low[] likelihood of confusion if there has been ample opportunity for consumer confusion."). The MOBU boots had nationwide distribution, Haas claims billions of its own advertising impressions every year, and the company regularly receives emails from the public. *See Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 299 (3d Cir. 2001) (emphasizing the lack of actual confusion despite "the large number of e-mails, customer inquiries, and other communications [the parties] receive[d]"). The Court finds it compelling that, despite all this opportunity, Haas could not unearth even one confused consumer.

Haas did offer a few pieces of evidence that it posited as showing actual confusion. This evidence included a handful of third-party website screenshots, (P- 1957, P-1958), and one business document where an employee of Dryshod's distributor asked whether MOBU stood for "Mossy Oak Break-Up," (P-19 at 3). This evidence does not establish any confusion, let alone confusion of the nature needed to tip the scales on this digit. *See Future Proof*, 982 at 297 (citing *Streamline*, 851 F.3d at 457).

Regarding the third-party website screenshots, the Court cannot accept Haas' bare inference that the screenshots mean "somebody thought MOBU meant Mossy Oak Break-Up." (1 Tr. 89:12–22). The Court heard no evidence about how those third- party websites are administered or

managed. Haas did not establish, for example, whether an actual person (confused or not) put the relevant content on those websites, as opposed to some algorithm or other automated process. (*See* 3 Tr. 19:3– 20:3; *see also* 2 Tr. 259:16–24 (noting possible reasons, other than confusion, for the websites' content)). Haas' witness who collected the screenshots admitted that she was merely "looking for things that had MOBU and the term 'Mossy Oak Break-Up' and not really judging their validity." (3 Tr. 16:13–16). In essence, Haas is inviting the Court to speculate that unexplained content on a third-party website means someone, somewhere was confused. The Court declines that invitation.

As for the question from the distributor's employee, the Court doubts whether a mere question can evidence actual confusion. *See, e.g.*, *Sterling Jewelers, Inc. v. Artistry Ltd.*, 896 F.3d 752, 768 (6th Cir. 2018) ("[Q]uestions about potential affiliation confirm that these sophisticated retailers discern a difference between the marks."). The Court heard no evidence about the employee's thinking when he asked the question. (*See* 3 Tr. 114:14–25). But regardless, actual confusion must be more than a fleeting mix-up of names—the plaintiff "'must show that the confusion . . . swayed consumer purchases.'" *Future Proof*, 982 F.3d at 297 (quoting *Streamline*, 851 F.3d at 457). Haas offered no such evidence.

Finally, the Court notes Haas' failure to produce a consumer survey. While surveys are not required, when a plaintiff has no other evidence of actual confusion (as here), its "failure to proffer survey evidence . . . suggests that the public is not likely to be confused." *Braun Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, 828 (Fed. Cir. 1992). Particularly given the visual and phonetic differences between the parties' marks and the lack of any other actual-confusion evidence, a survey would have been the most direct and persuasive way to show that consumers would make the connections offered by Haas.

vii. Degree of Consumer Sophistication (Digit Eight)

The eighth digit—consumer sophistication—depends partly on the price of the item. *Streamline*, 851 F.3d at 458. The record shows that Dryshod's boots generally retail for between $99 and $200 for an adult pair, and either $74.95 or $99.55 for a children's pair. (3 Tr. 120:20–121:4). The Court also heard testimony that Dryshod is premium brand at these prices. (*Id.* at 123:4–10). From this evidence, the Court can reasonably infer that the relevant consumers would have exercised at least some care in making their purchases, whatever their level of sophistication. *See Future Proof*, 982 F.3d at 297–98; *Streamline*, 851 F.3d at 458; *Smack Apparel*, 550 F.3d at 483. The Court heard no evidence that consumers would tend to make "quick decisions" when purchasing premium boots in this price range. *Future Proof*, 982 F.3d at 297. Also, to the extent Haas asserts that professional buyers (e.g., distributors and retailers) are among the relevant consumers in this case, the Court has little doubt that those professional buyers are sophisticated and thus unlikely to be confused. *See Oreck*, 803 F.2d at 173.

\*　　\*　　\*

Balancing the eight digits, Haas has failed to meet its burden. In reaching this conclusion, the Court finds particularly persuasive the dissimilarity of the parties' marks "on paper" (digit two), Haas' failure to show their similarity in context of the actual marketplace (digit two), and the lack of evidence of actual confusion (digit seven). *See Future Proof*, 982 F.3d at 289 (noting the Court's discretion to weigh the digits depending on the facts of the case).

At most, Haas has shown a hypothetical possibility of confusion. That is not enough. Its burden was to establish a likelihood of confusion, and it has not done so. The Court thus finds for Dryshod on Haas' claims for trademark infringement and unfair competition.

### B. Denial of Dryshod's Application to Register MOBU (Haas Count V)

Haas asks the Court for an order directing the PTO to refuse Donohue's pending application to register MOBU for "[f]ootwear; [w]aterproof footwear." U.S. Ser. No. 87/778,784. This request rests on the same allegations of trademark ownership and likelihood of confusion discussed above. For the same reasons, the Court finds for Dryshod on this claim. The Court also notes that camouflage is not part of the goods description in Donohue's application, making confusion even less likely. *See Octocom Sys., Inc. v. Hou. Comp. Servs., Inc.*, 918 F.2d 937, 942 (Fed. Cir. 1990) ("[R]egistrability of an applicant's mark must be decided on the basis of the identification of goods set forth in the application regardless of what the record may reveal as to the particular nature of an applicant's goods.").

### C. Declaratory Judgment of Non-Infringement (Dryshod Count III)

Dryshod seeks a declaratory judgment of trademark non-infringement. For the reasons discussed above, the Court finds for Dryshod.

### III. CONCLUSION

For the reasons stated, the Court finds Haas has failed to sustain its burden on all claims and so denies its remaining claims as provided herein. The Court will enter judgment by separate order.

**SIGNED** on July 21, 2022.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE